# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

NEC CORPORATION OF AMERICA, NEC CASIO MOBILE
COMMUNICATIONS, LTD., HTC CORPORATION, HTC AMERICA,
ZTE (USA), PANTECH CO., LTD., PANTECH WIRELESS, INC.,
LG ELECTRONICS, INC., and LG ELECTRONICS U.S.A., INC.,

Petitioners

v.

CELLULAR COMMUNICATIONS EQUIPMENT LLC,

Patent Owner

_____

Case IPR2014-01133
Patent Number: 7,218,923

_____

**CELLULAR COMMUNICATIONS EQUIPMENT LLC**

**PATENT OWNER'S RESPONSE**

i

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................... 1

II.     PETITION FAILED TO IDENTIFY ALL REAL PARTIES-IN-INTEREST

        ...................................................................................................... 3

        A.    Procedural Background ....................................................... 5

        B.    Legal Standard……………………………………………… 7

        C.    NEC Corporation is a Non-Party RPI……………………… 8

        D.    HTC America is a Non-Party RPI………………………… 13

III.    SUMMARY OF ARGUMENT.................................................... 20

        A.    Summary of Argument as to Ground A ............................ 20

        B.    Summary of Argument as to Ground B ............................ 22

IV.     OVERVIEW OF THE '8923 PATENT ...................................... 24

V.      CLAIM CONSTRUCTION ....................................................... 27

VI.     CLAIMS 1 AND 24 REQUIRE THAT THE "DIVERT[ING]" STEP
        OCCURS AFTER A MESSAGE HAS BEEN SENT FROM THE APPLICATION
        PROGRAM AND BEFORE THE MESSAGE IS RECEIVED AND
        CONTROLLED BY THE CONTROLLING ENTITY ......................................... 27

VII.    D'AVIERA DOES NOT ANTICIPATE THE CHALLENGED CLAIMS  30

        A.    D'Aviera Fails to Disclose the "Divert[ing]" Step as Required by
              Independent Claims 1 and 24 ............................................................. 30

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

B.   Testimony of Petitioner's Technical Expert Confirms that D'Aviera Fails to Disclose the Diverting Step as Required by Independent Claims 1 and 24 ................................................................ 33

VIII.  CALDER IN VIEW OF RICHARDSON DOES NOT RENDER ANY OF THE CHALLENGED CLAIMS UNPATENTABLE ........................................... 37

A.   Calder and Richardson Fail to Disclose the "Divert[ing]" Step as Required by Independent Claims 1 and 24 ........................................ 37

B.   Testimony of Petitioner's Technical Expert Confirms that Calder and Richardson Fail to Disclose the Diverting Step as Required by Independent Claims 1 and 24 ........................................................... 41

IX.   CONCLUSION ............................................................................. 45

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

# TABLE OF AUTHORITIES

**Cases**

*Askeladden LLC v. McGhie*,
IPR2015-00122 (Paper 30) ............................................................. 18

*Atlanta Gas Light Co. v. Bennett Regular Guards, Inc.*,
IPR2013-00453 (Paper 88) ............................................ 7, 11, 12, 13, 15, 18

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ....................................................................... 10

*Galderma S.A. v. Allergan Industrie, SAS*,
IPR2014-01422 (Paper 14) ......................................................... 17, 18

*GEA Process Eng'g, Inc. v. Steuben Foods, Inc.*,
IPR2014-00041 (Paper 135) ......................................... 8, 11, 12, 13, 18

*Gonzalez v. Banco Cent. Corp.*,
27 F.3d 751 (1st Cir. 1994) ............................................... 8, 17, 18

*Paramount Home Entertainment Inc. v. Nissim Corp.*,
IPR2014-00961 (Paper 11) ........................................................... 12

*Zerto, Inc. v. EMC Corp.*,
IPR2014-01254 (Paper 35) ............................................................. 18

*Zoll Lifecor Corp. v. Philips Elec. N. Am. Corp.*, IPR2013-606
(Paper 13) ................................................................... 7, 18, 19

**Statutes**

35 U.S.C. 31 ....................................................................................... 1

35 U.S.C. § 102(b) ............................................................................. 2

35 U.S.C. § 103(a) ............................................................................. 2

iv

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

35 U.S.C. § 312(a)(2).......................................................... 3, 4, 5, 7, 11, 12, 13, 19

35 U.S.C. § 315(b) .......................................................................... 11, 19

37 C.F.R. § 42 .......................................................................... 1, 3, 10, 11

**Other Authorities**

Changes to Implement Inter Partes Review Proceedings, Post-Grant Review
     Proceedings, and Transitional Program for Covered Business Method Patents,
     77 Fed. Reg. 48,680 (Aug. 14, 2012) ......................................................... 11, 18

Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756 (Aug. 14, 2012)..... 7, 8, 11

**EXHIBIT LIST**

| Exhibit No. | Title |
|---|---|
| 2001 | Declaration of John P. Murphy in Support of Unopposed Motion for *Pro Hac Vice* Admission (March 17, 2015) |
| 2002 | Transcript of Conference Call with the Board on April 3, 2014 |
| 2003 | Intentional Gap in Exhibit Numbers |
| 2004 | Intentional Gap in Exhibit Numbers |
| 2005 | Proofs of Service, Civil Action Nos. 6:13-cv-507, 6:13-cv-508, 6:13-cv-509, 6;13-cv-511, 6:13-cv-568, 6:13-cv-569, 6:13-cv-584 |
| 2006 | Plaintiff's First Amended Complaint for Patent Infringement, *Cellular Communications Equipment LLC v. HTC Corporation, et al.*, Case No. 6:13-cv-507 (E.D. Tex.) (March 21, 2014) |
| 2007 | Defendant NEC Corporation of America Inc.'s Corporate Disclosure Statement, *Cellular Communications Equipment LLC v. NEC Casio Mobile Communications, Ltd., et al.*, Case No. 6:13-cv-584-LED (E.D. Tex.) |
| 2008 | Defendant NEC Casio Mobile Communications, Ltd.'s Corporate Disclosure Statement, *Cellular Communications Equipment LLC v. NEC Casio Mobile Communications, Ltd., et al.*, Case No. 6:13-cv-584-LED (E.D. Tex.) |
| 2009 | March 24, 2010 Press Release Regarding the Merger between NEC's Mobile Terminal Unit and Casio Hitachi Mobile Communications |
| 2010 | HTC Defendants' Corporate Disclosure Statement, *Cellular Communications Equipment LLC v. HTC Corporation, et al.,* Case No. 6:13-cv-00507-LED (E.D. Tex.) |
| 2011 | Declaration of Stephanie Bariault in Support of Defendants' Motion to Transfer Venue and Supporting Memorandum of Law, *Rothschild Storage Retrieval Innovations, LLC v. HTC Corporation, et al.,* Case No. 1:14-cv-22655-KMW (S.D. Fla.) |
| 2012 | Defendant HTC Corporation, HTC America, Inc., and Exedea Inc.'s Initial Disclosures*, Cellular Communications Equipment LLC v. HTC Corporation, et al.,* Case No. 6:13-cv-507 (E.D. Tex.) |
| 2013 | Non-Confidential Petition for Writ of Mandamus of HTC Corporation and HTC America, Inc., *In Re HTC Corporation and HTC America, Inc.* |

| Exhibit No. | Title |
|---|---|
| 2014 | January 16, 2013 letter from Brandon M. White to Honorable Lisa R. Barton, Acting Secretary for the U.S. International Trade Commission enclosing for filing Respondents HTC Corporation's and HTC America, Inc.'s Verification to their Response to the Third Amended Complaint of Immersion Corporation under Section 337 of the Tariff Act of 1930, as Amended, and Counterclaims of HTC Corporation and HTC America, Inc. |
| 2015 | Joint Submission on Public Interest of Proposed Respondent HTC and Non-Party Google, *In the Matter of Certain Communications or Computing Devices, and Components Thereof*, Investigation No. 337-TA-3022, U.S. ITC, Washington D.C. |
| 2016 | David Wiggins's Declaration in Support of Defendants' Joint Motion to Transfer, *Vantage Point Technology, Inc. v. Amazon.com Inc. et al.,* Case No. 2:13-cv-909-JRG (E.D. Tex.) |
| 2017 | Declaration of Vincent Lam on Behalf of Third-Party HTC in Response to Motion to File Under Seal, *Apple, Inc. v. Samsung Electronics Co., Ltd, et al.,* Case No. 11-cv-01846-LHK (N.D. Cal.) |
| 2018 | Brief for *Amici Curiae* Google, Inc., HTC Corporation, HTC America, Inc., Rackable Hosting, Inc., Red Hat, Inc. and SAP America, Inc. in Support of Appellees, *Apple Inc. v. Samsung Electronics Co., Ltd., et al.,* No. 2013-1129, U.S. Court of Appeals for the Federal Circuit |
| 2019 | Patent License and Settlement Agreement Between HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd. and Apple Inc. |
| 2020 | Transcript of April 28, 2015 Deposition of Tim Williams, Ph.D. |

Patent Owner, Cellular Communications Equipment, LLC, ("CCE")

pursuant to 37 § C.F.R 42.120, hereby submits this Response to the Petition (Paper

1) filed by NEC Corporation of America, NEC Mobile Communications, Ltd.,

HTC Corporation, HTC America, ZTE (USA), Inc., Pantech Co., Ltd., Pantech

Wireless, Inc., LG Electronics, Inc., and LG Electronics U.S.A., Inc. (collectively,

"Petitioner") for *inter partes* review of U.S. Patent No. 7,218,923 (Ex. 1001; the

"'8923 Patent").  As discussed in detail below, Petitioner has failed to meet its

burden of providing by a preponderance of the evidence that any of the challenged

claims of the '8923 Patent are unpatentable, as required by Chapter 31 of Title 35

of the United States Code.  Accordingly, Patent Owner respectfully requests that

the Patent Trial and Appeal Board (the "Board") issue a final written decision in

favor of the Patent Owner on all Grounds.  CCE also respectfully requests that the

Board terminate this proceeding because the petition failed to identify all real

parties-in-interest.

## I.    INTRODUCTION

On July 10, 2014, Petitioner filed the Petition seeking *inter partes* review of

claims 1-5, 8-9, 24-26, 31, 33, 39, and 40 of the '8923 Patent.

On October 23, 2014, Patent Owner filed a Preliminary Response to the

Petition, which presented various arguments as to why none of the proposed

grounds raised in the Petition rendered any of the challenged claims unpatentable, and requested that *inter partes* review not be instituted. (Paper 9).

On January 15, 2015, the Board issued an initial decision ("Decision"), granting certain of the proposed grounds in the Petition, and instituting an *inter partes* review for claims 1, 2, 4, 5, 8, 24, 25, and 31 of the '8923 Patent.  (Paper 10).  Specifically, the Board granted the Petition as to only the following grounds:

- Ground A:  Rejection of claims 1, 2, 4, 5, 8, 24, 25, and 31 under 35 U.S.C. § 102(b) as anticipated by U.K. Patent Application No. GB 2376766 to D'Aviera (Ex. 1008; "D'Aviera").

- Ground B:  Rejection of claims 1, 2, 4, 5, 8, 24, 25, and 31 under 35 U.S.C. § 103(a) as obvious over U.S. Patent Publication No. 2002/0065869 to Calder (Ex. 1010; "Calder") in view of U.S. Patent No. 7,836,494 to Richardson (Ex. 1007; "Richardson").

(Decision, p. 17).

As discussed below, Patent Owner submits that the challenged claims are patentable over the references cited in Grounds A and B above because the references fail to disclose, alone or in combination, each element of independent claims 1 and 24.

## II.    Petitioner Failed to Identify the Real Parties at Issue in its Petition.

CCE requests that the Board terminate this proceeding pursuant to 37 C.F.R. § 42.72, because the petition failed to identify NEC Corporation as a real party-in-interest ("RPI"), as required by 35 U.S.C. § 312(a)(2).  Additionally and alternatively, CCE requests that the Board terminate this proceeding, because the petition failed to identify HTC America as an RPI.[1]

At the time the petition was filed, NEC Corporation was an unidentified RPI that possessed and exercised <u>actual</u> control over this proceeding, evidenced by NEC Corporation controlling the withdrawal of two petitioners from this proceeding:  NEC Corporation of America and NEC Mobile Communications Limited (collectively, the "NEC Petitioners").  The control of NEC Corporation over the NEC Petitioners is established in the Joint Motion to Terminate filed by the NEC Petitioners on February 5, 2015, which states unequivocally that NEC Corporation entered an agreement <u>on their behalf</u> requiring termination of the NEC Petitioners' role in this proceeding.  Because NEC Corporation exercised actual

---

[1] Although HTC America was identified as an RPI in this proceeding, CCE is presenting arguments regarding the failure to include HTC America an RPI in the petition, should the Board find that HTC America was only identified as an RPI in these proceedings due to scrivener's error, as argued by counsel for HTC.

3

control over the petition and two petitioners, it was a *de facto* RPI — but the petition fails to identify it as such. Accordingly, the petition was incomplete as filed and, pursuant to 35 U.S.C. § 312(a)(2), should not have been considered. The Board should thus vacate the institution decision in this case, which was based on a defective petition.

Additionally, the petition failed to identify another RPI — HTC America, Inc. ("HTC America"). HTC America is the operating entity through which HTC Corporation (itself a named RPI in each petition) acts in the United States. The complete unity of interest and action between these entities is apparent. HTC America is HTC Corporation's wholly-owned subsidiary; both are accused of infringing CCE's patents, and they are invariably represented by the same counsel — not only in related litigation against CCE and IPR cases against these patents, but also in dozens of other patent proceedings in district courts, appellate courts, the ITC, and the PTAB. Indeed, they routinely file pleadings together as "HTC" in such matters, and their in-house legal representatives speak and act on behalf of both entities simultaneously.

HTC America is inextricable from HTC Corporation for purposes of this proceeding, and it must identified as an RPI in this petition filed by its corporate parent. Indeed, that is precisely what was done in <u>every</u> petition HTC Corporation filed before and since this petition — in 35 of the 39 IPR petitions filed by HTC

Corporation to date, HTC America is identified as a RPI.  Indeed, HTC America was correctly identified as an RPI in two petitions filed against CCE (challenging the '8923 and '019 patents); the <u>only</u> exceptions are the petitions filed against the '9923, '174, '804, and '820[2] patents.  There is no plausible justification for this inconsistency; HTC America should have been identified as an RPI in each of the petitions filed against CCE.  It was not, and because 35 U.S.C. § 312(a)(2) forbids consideration of any petition that fails to identify <u>all </u>RPIs, the Board's should vacate its institution decisions addressing the '9923, '174, and '804 patents[3] for failing to identify HTC America as an RPI.

## A.     Procedural Background

This proceeding relates to infringement lawsuits brought by CCE against multiple defendants, consolidated in a single action captioned Cellular

---

[2] In light of the Board's Decision Denying Institution of Inter Partes Review of U.S. Pat. 8,055,820 (Case IPR2014-01136, Paper 10), that patent is not addressed in detail here, though that petition shares the same deficiencies discussed here: neither NEC Corporation nor HTC America are identified as RPIs.

[3] And the '8923 and '019 patents, should the Board find that HTC America was only identified as an RPI in these proceedings due to scrivener's error, as argued by counsel for HTC.

Communications Equipment LLC v. HTC Corporation, et al., No. 6:13-cv-507

(E.D. Tex.).  CCE's original complaints, served between June and August 2013,

accused various defendant groups of infringing the '8923, '174, and/or '804

patents.  *See* Ex. 2005.  In March 2014, CCE amended its complaints against

certain defendants to incorporate infringement allegations under the'019 patent.

*See* Ex. 2006.

A subset of the defendants in those cases, including HTC Corporation, HTC

America, Inc., NEC Casio Mobile Communications, Ltd. (f/k/a NEC Casio Mobile

Communications, Ltd.), and NEC Corporation of America, filed IPR petitions

against the '9923, '8923, '174, and '804 patents in July 2014, and against the '019

patent in August 2014.  Between October 23 – October 29, 2014, CCE filed its

Preliminary Responses for the '9923, '8923, '174, and '804 patents, and CCE filed

its Preliminary Response for the '019 patent on December 2, 2014.

On November 17, 2014, CCE and NEC Corporation entered into a

Settlement and Patent License Agreement.  Ex. 1012 at 11.  However, the terms of

the Agreement were not met by NEC Corporation until January 2015.  On

February 5, 2015, the NEC Petitioners filed a Joint Motion to Terminate at the

behest of NEC Corporation. (Paper 13 at 2-3).

### B.    Legal Standard.

A petition for *inter partes* review "may be considered only if…the petition identifies all real parties in interest."  (emphasis added).  35 U.S.C. § 312(a)(2). This statutory requirement is a "threshold issue" for consideration of a petition. *Atlanta Gas Light Co. v. Bennett Regulator Guards, Inc.*, IPR2013-00453 (Paper 88) at 6-7 (citing *ZOLL Lifecor Corp. v. Philips Elec. N. Am. Corp.*, IPR2013-00606 (Paper 13) at 10.  The Board generally accepts a petitioner's identification of RPIs at the time of filing, and this acceptance acts as a rebuttable presumption benefiting petitioners.  *Id*. at 7-8.  However, this presumption does not shift the burden of persuasion, which remains on petitioners.  *Id*.  When a patent owner provides sufficient rebuttal evidence to reasonably question the accuracy of the RPIs identified, it is petitioner's burden "to establish that it has complied with the statutory requirement[.]"  *Id*.

The "core functions" of the real party in interest requirement are to assist Board members in identifying potential conflicts and assure proper application of estoppel provisions.  77 Fed. Reg. 48,759.  Whether an unnamed party is a RPI is a "highly fact-dependent question."  *Id*.  An RPI may be the petitioner, or a party or parties at whose behest the petition has been filed.  *Id*.

A key factor in the RPI inquiry is whether an unnamed party "exercised or could have exercised control over a party's participation in a proceeding."  *Id*.

Absolute control is not required; "it should be enough that the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties." *Id*. A non-party's participation may be "overt or covert, and the evidence may be direct or circumstantial—but the evidence as a whole must show that the nonparty possessed effective control from a practical standpoint." *GEA Process Eng'g, Inc. v. Steuben Foods, Inc.*, IPR2014-00041 (Paper 135) at 14 (*citing Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994)).

Additional factors relevant to determining whether a party is an RPI include funding of IPR proceedings, corporate ties and the relationship between a non-party and the petitioner, alignment of interests and defenses between a non-party and petitioner in related litigation, representation by the same counsel in related litigation, designation of common in-house representatives in legal proceedings, and admitted ties and cooperation between concerning related legal matters. *See id.* at 19-20; 77 Fed. Reg. 48,759.

### C.   NEC Corporation is a Non-Party RPI.

Petitioner NEC America is a wholly owned subsidiary of NEC Corporation, a Japanese company. *See* Ex. 2007 at 1. Petitioner NEC Mobile Communications is owned in part by NEC Corporation, CASIO Computer Co., Ltd. and Hitachi,

Ltd.  *See* Ex. 2008 at 1.  NEC Corporation holds a controlling interest in NEC

Mobile Communications.  *See* Ex. 2009 at 1.

Both NEC Petitioners are identified as RPIs in the petitions filed against the

'9923, '8923, '174, '804, and '019 patents.  IPR2014-01131, Paper 5 at 1;

IPR2014-01133, Paper 1 at 1; IPR2014-01134, Paper 10 at 1; IPR2014-01135,

Paper 4 at 1; IPR2014-01318, Paper 1 at 1.  Yet incontrovertible evidence

establishes that NEC Corporation — which was <u>not</u> identified as an RPI in any

petition — had absolute, direct, and overt control over the NEC Petitioners'

participation in those IPRs.  This is unequivocally established by their own

statements to the Board made in February 2015.  In their February 5 Joint Motion

to Terminate, the NEC Petitioners explained that:

> CCE and <u>NEC Corporation (on behalf of Petitioner NEC</u>) reached an
> agreement settling the matters in controversy among the parties
> involving the following patents: U.S. Patent Nos. 6,819,923 (the
> "'9923 patent"), 7,218,923 (the "'8923 patent"), 7,941,174 (the "'174
> patent"), 6,377,804 (the "'804 patent"), 8.055,820 (the "'820 patent");
> and 6,810,019 (the "'019 patent") (collectively, the "Asserted
> Patents").  More specifically, CCE and NEC Corporation have agreed
> to settle and dismiss their related district court litigation involving the
> Petitioner NEC . . . <u>CCE and NEC Corporation have also agreed to</u>
> <u>jointly request termination of this proceeding with respect to</u>
> <u>Petitioner NEC as well as to jointly request termination with respect</u>

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

<u>to Petitioner NEC with respect to IPRs filed for the above listed</u>

<u>patents</u>.

(emphasis added).  (Paper 13 at 2-3).

Indeed, Section 4.6 of the Settlement and Patent License Agreement between CCE and NEC Corporation was included for the purpose of the withdrawal of the NEC Petitioners from this proceeding.  *See* Ex. 1012 at 5.  *See also* Paper 13 at 3 ("Pursuant to 37 C.F.R. § 42.74(b), the above referenced settlement agreement made in contemplation of termination of the proceeding are in writing, and a true and correct copy of that document is being filed herewith as Exhibit 1012).  NEC Corporation's control over the NEC Petitioners flows from the unique relationship between a parent and wholly-owned subsidiary, which establishes "a complete unity of interest" between them.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . .  They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.").

Because it had actual control over the NEC Petitioners, NEC Corporation was an RPI at the time the petition was filed.  Yet, the petition failed to identify NEC Corporation as an RPI.  Because the petition was fatally deficient when filed, the petition should not have received a filing date or been considered by the Board.  U.S.C. § 312(a)(2) (forbidding consideration of a petition that fails to identify all RPIs); 77 Fed. Reg. 48,763 ("To obtain a filing date, the petition must meet certain minimum standards"); *GEA* at 22 ("Pursuant to statutory authority, <u>we may not consider a petition unless it includes the identification of all real parties-in-interest.</u>") (emphasis added).  In light of this clear statutory deficiency, the Board should vacate its institution decision in in this proceeding.  *See Atlanta* at 1 (vacating decision to institute).

Correction of the petition at issue requires assigning it a new filing date.  37 C.F.R. §§ 42.106(b), 42.8(b)(1); 77 Fed. Reg. 48,699 ("There is no provision allowing for the correction of a mistake that is not clerical or typographical in nature without a change in filing date.").  A new filing date would necessarily fall more than a year after the petitioners were served with CCE's complaints.  Thus, a corrected petition would be time-barred under 35 U.S.C. § 315(b).  Accordingly, once the institution decision is vacated, this proceeding should be terminated.  The NEC Petitioners' withdrawal from these proceedings does not cure the defect in the original petition.  35 U.S.C. § 312(a)(2) forbids consideration of a petition

11

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

that fails to identify all RPIs.  Based on NEC Corporation's actual control over the

NEC Petitioners, it is clear that the petition was unfit for consideration, and the

Board's institution decision —which was founded on the defective petition —

should be vacated.

Indeed, the lack of a rule allowing correction to RPI identification without

changing the filing date "is consistent with the contemplated importance of

identifying all the RPIs in the petitions."  *GEA Process Eng'g, Inc. v. Steuben*

*Foods, Inc.*, IPR2014-00041 (Paper 135) at 24.  "The board relies on petitioner's

identification of the RPI to determine conflicts of interest for the Office, the

credibility of evidence presented in a proceeding, and standing of a party that

previously has filed a civil action involving a patent for which an IPR is

requested."  *Id*.  Failure to identify all RPIs impedes the Board's ability to properly

evaluate the petition, and frustrates the express disclosure requirements enacted by

Congress.  *See id*.  Overlooking a clear violation of that statutory edict would

foster and even encourage lax identification of RPIs at the inception of an IPR

proceeding — when forthcoming disclosure is most necessary to avoid

unnecessary expense and misuse of the Board's resources.

Since the Petition does not satisfy the statutory requirement, the Petition

cannot be considered.  *See Atlanta* at 13 ("The Petition is, therefore, incomplete

and, pursuant to 35 U.S.C. § 312(a)(2), may not be considered.");  *Paramount*

12

*Home Entertainment Inc. v. Nissim Corp.*, IPR2014-00961 (Paper 11) at 11-12

(Since "the Petition [is] non-compliant with 35 U.S.C. § 312(a)(2) . . . . we may not

consider the Petition."); *GEA* at 22 ("Pursuant to statutory authority, we may not

consider a petition unless it includes the identification of all real parties-in-

interest.").  In light of this clear statutory deficiency, the Board should vacate its

institution decision in in this proceeding.  *See Atlanta* at 1 (vacating decision to

institute).

### C.    HTC America is a Non-Party RPI.

Petitioner HTC Corporation is a publicly-traded company headquartered in

Taiwan; HTC America is wholly owned directly and indirectly by HTC

Corporation.  *See* Ex. 2010 at 1; Ex. 2013 at i.  With regard to patent-related

proceedings in the United States, HTC America acts on behalf of HTC

Corporation.  Indeed, HTC personnel have submitted sworn declarations

confirming that HTC Corporation's operations in the United States are exclusively

managed by and coordinated through HTC America.  Ex. 2011 at ¶ 4.  Consistent

with this, HTC Corporation and HTC America routinely file pleadings jointly as

"HTC," and are represented by the same counsel in proceedings before district

courts, appellate courts, the ITC, and the PTAB.  *See, e.g.*, Ex. 2012 at 2 (Initial

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

Disclosures filed jointly by HTC Corporation and HTC America)[4]; Ex. 2013 at 1;
Ex. 2014 at 2; Ex. 2015 at 1; IPR2014-01460, Paper 1; IPR2015-00384, Paper 1.

Indeed, the same outside counsel (Dr. Steven Moore of Pillsbury Winthrop)
represents both HTC Corporation and HTC America in the district court litigation
and the IPR petitions filed against the '9923, '8923, '174, '804, and '019 patents.
*See* Ex. 2010 at 2; *see also* IPR2014-01135, Paper 2 at 1; IPR2014-01131, Paper 1
at 8; IPR2014-01133, Paper 2 at 1; IPR2014-01134, paper 2 at 1; and IPR2014-
01318 Paper 2 at 3.  HTC Corporation's actions and statements in these
proceedings are thus indistinguishable from those of HTC America.  As Pillsbury
Winthrop attorneys discussed, prepared, and filed IPR petitions against the
challenged patents on behalf of HTC Corporation, they undoubtedly acted on
behalf of HTC America as well.

Further confirming the inextricable relationship between them, HTC
Corporation and HTC America are represented by the same inside counsel.  For
instance, HTC America's Director of Patent Litigation, David Wiggins, speaks and
acts on behalf of HTC Corporation in patent disputes, and has submitted sworn
testimony to the ITC as counsel for both HTC America and HTC Corporation.  *See*

---

[4] Ex. 2012 was designated as "Highly Confidential – Attorneys Eyes Only" in the
underlying litigation and is not concurrently being submitted herewith.

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

Ex. 2016 at ¶ 1; Ex. 2014 at 2; Ex. 2015 at 1, 6.  HTC America's Executive Patent

Litigation Director, Vincent Lam, reports directly to the General Counsel of HTC

Corporation, manages patent disputes involving HTC Corporation in district courts

and the ITC, and speaks on behalf of HTC Corporation regarding sensitive

corporate matters. Ex. 2017 at ¶¶ 1, 3, 4.

The Power of Attorney for "Petitioner**s** HTC Corporation" in IPR2014-

01135 was signed on behalf of Owais Siddiqui, who is Senior Director Patent

Litigation Counsel for HTC America.  (emphasis added)  *See* IPR2014-01135,

Paper 2 at 1.  Further, HTC's General Counsel, Grace Y. Lei, identifies herself as

General Counsel for HTC America in pleadings submitted to the Board in other

cases.  *See*, *e.g.*, IPR2014-01460, Paper 2 at 2; IPR2015-00384, Paper 2 at 2.  The

Power of Attorneys for "Petitioner**s** HTC Corporation" in IPR2014-01131,

IPR2014-01133, IPR2014-01134, and IPR2014-01318 were signed on behalf of

Grace Lei.  (emphasis added)  *See* IPR2014-01131, Paper 1 at 8; IPR2014-01133,

Paper 2 at 1; IPR2014-01134, Paper 2 at 1; and IPR2014-01318 Paper 2 at 3.

At the very least, the boundary lines are sufficiently blurred between the

HTC entities such that "it is difficult for both insiders and outsiders to determine

precisely where one ends and another begins." *Atlanta* at 11.

There is simply no meaningful distinction between those entities for

purposes of these IPR proceedings.  HTC Corporation and HTC America are both

15

defendants in the lawsuits filed by CCE; they share identical interests in invalidating the challenged patents, assert identical defenses in that litigation, and identify the same employees as potential witnesses. *See e.g.*, Ex. 2012 at 1, 5-20 (Initial Disclosures filed jointly by HTC Corporation and HTC America). More broadly, HTC Corporation and HTC America speak with a single voice in amicus briefs submitted to the Federal Circuit regarding matters of U.S. patent law and policy. Ex. 2018 at 1. And, both HTC Corporation and HTC America are signatories signed by the same corporate representative to patent license agreements settling and terminating patent litigation and opposition proceedings with U.S. corporations. *See* Ex. 2019 at 143 (HTC-Apple License).

Indeed, the singularity between HTC Corporation and HTC America in IPR proceedings is confirmed by the fact that, when HTC Corporation files an IPR, HTC America is always an RPI — except for a handful of IPRs filed against CCE. Specifically, in 35 of the 39 IPR petitions filed by HTC Corporation to date (including two IPR petitions filed against CCE, challenging the '8923 and '019 patents), HTC America is correctly identified as a RPI, and is represented by the same counsel as its corporate parent.[5] The <u>only</u> exceptions are the petitions filed

---

[5] *See* Petitions for *Inter Partes* Review filed in IPR2015-00807; IPR2015-00806; IPR2015-00384; IPR2015-00159; IPR2015-00161; IPR2015-00163; IPR2015-

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

against the '9923, '174, '804, and '820 patents.  This disparity speaks for itself —

given its invariable role in IPRs filed by its corporate parent, there is no

justification for excluding HTC America as an RPI from a subset of these cases.

When there is an issue of "shared corporate leadership" the Board has determined

that:

> [w]hether an unnamed party is a real party in-interest based on 'the
> availability of a significant degree of effective control in the
> prosecution or defense of the case—what one might term, in the
> vernacular, the power—*whether exercised or not*—to call the shots.'

*Galderma S.A. v. Allergan Industrie, SAS*, IPR2014-01422 (Paper 14) at 8 (quoting

*Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 758 (1st Cir. 1994)) (emphasis in

original).

---

00172; IPR2014-01460; IPR2015-01249; IPR2014-01198; IPR2014-01199;

IPR2014-01157; IPR2014-01155; IPR2014-01158; IPR2014-01154; IPR2014-

01156; IPR2014-01133; IPR2014-01318; IPR2014-00989; IPR2014-00989;

IPR2014-00937; IPR2014-00905; IPR2014-00903; IPR2014-00902; IPR2014-

00841; IPR2014-00640; IPR2014-00627; IPR2014-00622; IPR2014-00623;

IPR2014-00624; IPR2014-00625; IPR2014-00407; IPR2014-00408; IPR2014-

00212; and IPR2014-00209.

The evidence of control or "participation . . . may be circumstantial, but the evidence, as a whole, must show that the non-identified party possessed effective control from a practical standpoint.  This inquiry is not based on isolated facts, but rather must consider the totality of the circumstances."  *Askeladden LLC v. McGhie*, IPR2015-00122 (Paper 30) at 7-8 (citing *Gonzalez*, 27 F.3d at 759 (internal citation omitted); *see also Galderma* at 7; *Zerto* at 8; *GEA* at 14; *Zoll* at 9.  "[W]hen, as here, a patent owner provides sufficient rebuttal evidence that reasonably brings into question the accuracy of a petitioner's identification of the real parties-in-interest, the burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all the real parties-in-interest."  *Galderma* at 6-7; *see also Askeladden* at 8; *Zerto* at 7; *Atlanta* at 8.  "This allocation of the burden . . . [to Petitioner] appropriately accounts for the fact that a petitioner is far more likely to be in possession of, or have access to, evidence relevant to the issue than is a patent owner."  *Zerto* at 7; *see also Atlanta* at 8.  "[T]he statutory provision is clearly an ongoing requirement that must be complied with during the pendency of the petition."  *GEA* at 12; see also Comments to Final Rules, 77 FED. REG. 48695 ("After institution, standing issues may still be raised during trial.")

These facts paint a clear picture.  HTC America is the operating entity that acts on behalf of HTC Corporation in the United States; its interests and actions are

co-extensive with those of its corporate parent.  Without fail, they rely on the same

counsel and witnesses, adopt the same positions, share the same interests, and

pursue the same goals.

All of this "evidence, as a whole," when considering the "totality of the

circumstances," *Zoll* at 9, demonstrates that, not only did HTC America's patent

attorneys and officers have, and continue to have, the opportunity to control this

proceeding, but also that they actually exercised that control, as evidenced by the

Power of Attorney signed on behalf of an officer of HTC America in the related

proceeding IPR2014-01135.

Accordingly, HTC America is necessarily an RPI that should have been

identified as such in the petitions HTC Corporation filed against the '9923, '174,

'820, and '804 patents — as it was in 35 of the 39 other petitions.  Petitioners

cannot possibly meet their burden to prove otherwise.  This error is fatal in light of

35 U.S.C. § 312(a)(2).  The Board is statutorily forbidden from considering a

petition that fails to identify all RPIs, and it should thus vacate its decisions to

institute based on improper petitions.  As correction of the petitions would require

assignment of a new filing date, such petitions would be time barred under 35

U.S.C. § 315(b) because they would be submitted more than a year after service of

the complaint on petitioners.

## III.   SUMMARY OF ARGUMENT

In addition to the real parties-in-interest issue raised above, Patent Owner respectfully asserts that all of the challenged claims in this proceeding are patentable over the two remaining Grounds A and B.  For at least the reasons discussed below, Petitioner has failed to meet its burden of demonstrating, by a preponderance of the evidence, that any of the challenged claims are not patentable over the references relied upon in Grounds A and B.  In particular, the references fail to disclose the "divert[ing]" limitation as recited in independent claims 1 and 24.

### A. Summary of Argument as to Ground A

D'Aviera is totally devoid of any disclosure of "diverting" a message to the claimed controlling entity.  For example, D'Aviera fails to disclose, teach, or suggest "diverting a message of the messages **to a controlling entity** residing in the communication terminal," as recited in independent claim 1.  (emphasis added).  D'Aviera also fails to disclose, teach, or suggest "a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network **to a controlling entity** residing in the terminal," as recited in independent claim 24.  (emphasis added).

Both the Petition and Petitioner's technical expert, Dr. Williams, fail to identify any disclosure of "diverting" a message to the claimed controlling entity.

20

Rather, Dr. Williams testified that D'Aviera's isolation engine 225 corresponds to both the "diverting unit" and the "controlling entity." *See* Deposition Transcript of Dr. Tim Williams, April 28, 2015, Ex. 2020, "Williams Dep." at 24:4-7; 22:7-11; 18:12-18; 25:23-25.  In particular, Dr. Williams testified that the "divert[ing]" step, as recited in claims 1 and 24, is performed by D'Aviera's isolator engine 225.  *See* Williams Dep. at 24:4-7; 22:7-11.  Dr. Williams further testified that D'Aviera's isolator engine 225 also corresponds to the "controlling entity," as recited in claims 1 and 24.  *See* Williams Dep. at 18:12-18; 25:23-25.  Dr. Williams testified that the "divert[ing]" step is performed by D'Aviera's isolator engine 225 after the message has already been received by the isolator engine 225 because the isolator engine 225 has to analyze the message to determine whether or not to divert the message.  *See* Williams Dep. at 24:11-23.  Dr. Williams' testimony acknowledges that the corresponding "divert[ing]" step in D'Aviera is not only performed by the alleged controlling entity (i.e., the isolator engine 225), but that the "divert[ing]" step in D'Aviera occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the isolator engine 225).  *See* Williams Dep. at 23:9-10, 16-23; 24:11-23.   Thus, Dr. Williams' testimony confirms that D'Aviera cannot disclose "divert[ing]" a message to a controlling entity, as recited in claims 1 and 24, because the alleged "divert[ing]" step in D'Aviera occurs after the message has already been received by the alleged controlling entity.

### B. Summary of Argument as to Ground B

The proposed combination of Calder and Richardson is totally devoid of any disclosure of "diverting" a message to the claimed controlling entity.  For example, Calder and Richardson both fail to disclose, teach, or suggest "<u>diverting a message of the messages **to a controlling entity**</u> residing in the communication terminal," as recited in independent claim 1.  (emphasis added).  Calder and Richardson also both fail to disclose, teach, or suggest "<u>a diverting unit configured to divert a message of the messages</u> sent from the application program and destined for the communication network **to a controlling entity** residing in the terminal," as recited in independent claim 24.  (emphasis added).

Both the Petition and Petitioner's technical expert, Dr. Williams, fail to identify any disclosure of "diverting" a message to the claimed controlling entity.  Rather, Dr. Williams testified that Calder's interception module corresponds to both the "diverting unit" and the "controlling unit."  *See* Williams Dep. at 44:13-19.  In particular, Dr. Williams testified that the "diverting" step, as recited in claims 1 and 24, is performed by Calder's interception module.  *See* Williams Dep. at 41:1-4; 41:22-24; 44:13-19.  Dr. Williams further testified that Calder's interception module also corresponds to the "controlling entity," as recited in claims 1 and 24.  *See* Williams Dep. at 44:13-19.  Dr. Williams testified that the "diverting" step is performed by Calder's interception module after the message

has already been received by the interception module because the interception

module has to analyze the message to determine whether or not to divert the

message. *See* Williams Dep. at 41:12-21; 44:20-45:2.  Dr. Williams' testimony

acknowledges that the corresponding "divert[ing]" step in Calder is not only

performed by the alleged controlling entity (i.e., the interception module), but that

the "divert[ing]" step in Calder occurs after the message has already been received

and analyzed by the alleged controlling entity (i.e., the interception module).  *Id.*

Thus, Dr. Williams' testimony confirms that Calder cannot disclose "divert[ing]" a

message to a controlling entity, as recited in claims 1 and 24, because the alleged

"divert[ing]" step in Calder occurs after the message has already been received by

the alleged controlling entity.

Richardson does not cure the deficiencies of Calder.  In its Decision, the

Board found that Richardson does not disclose the "divert[ing]" step, as recited in

claims 1 and 24.  Further, the claims charts for the proposed Calder and

Richardson combination submitted with the Petition and the Declaration do not

provide any citations or explanation that Richardson could possibly disclose the

claimed diverting unit.  *See* Petition at 51; Declaration at Appendix B-1, 24-25.

For at least the foregoing reasons, the Petition falls far short of providing by

a preponderance of the evidence that Grounds A and B render any of the

challenged claims unpatentable.  Thus, Patent Owner respectfully requests that the Board confirm the patentability of all of the challenged claims as originally issued.

## IV.    OVERVIEW OF THE '8923 PATENT

The '8923 patent was filed in the U.S Patent and Trademark Office on June 8, 2004 (U.S. Application No. 10/862,878), and claims foreign priority to Finnish Application No. FL20031860, filed in the Finnish Patent Office on December 18, 2003.  The '8923 patent was issued on May 15, 2007 including 40 claims, among which claims 1, 9, 24, 33, 39, and 40 are independent.

The '8923 patent is directed to a method and mechanism for controlling the rights and/or behavior of applications in a mobile terminal.  ('8923 patent at Abstract).  The controlling can be done by a controlling entity or trusted agent 212 that resides in a tamper resistant area 200 of the mobile terminal.  (Id. at 3:57-66).  As shown in FIG. 2 of the '8923 patent, reproduced below, applications $210_1$ through $210_N$ can access the network through a protocol stack 220 (e.g., a Session Initiation Protocol (SIP) stack).  (Id. at 4:2-4).

CASE IPR2014-01133
U.S. Pat. No. 7,218,923



**FIG. 2**

In one embodiment, the rights and/or behavior of applications $210_1$ through $210_N$ are controlled in connection with sending one or more INVITE requests or messages to the network through a protocol stack (e.g., the SIP protocol stack 220) and subsequently to an opposite terminal.  (*Id.* at 4:46-48).  FIG. 3 of the '8923 patent, reproduced below, illustrates an example of the application controlling process by message exchange between terminal entities.

25



**FIG. 3**

For example, when the protocol stack 220 receives an outbound INVITE request generated by an application, the protocol stack 220 determines whether the application needs to be controlled before sending the INVITE request to the network. (Id. at 4:53-57). If the application needs to be controlled, the INVITE request is then selectively sent or diverted to the trusted agent 212 residing in the tamper resistant area 200 (step 7). (*Id*. at 4:57-61 and 2:23-32). The trusted agent 212 then examines the request and controls whether the application behaves as it

26

should be behaving (step 8).  (*Id*. at 4:61-63).  If the application does not need to be controlled, the protocol stack transmits the INVITE request directly to the network, without diverting the INVITE request to the trusted agent 212.  (*Id*. at 5:5-8).

## V.      CLAIM CONSTRUCTION

In its Decision, the Board set forth initial constructions for certain terms and phrases recited in the challenged claims.  In particular, the Board determined that the broadest reasonable construction of the claim term "divert" is "to change the course of," and the claim term "diverting" is "changing the course of."  (Decision at 5-6).

Petitioner's technical expert, Dr. Williams, acknowledged that the Board's construction of "divert" and "diverting" did not change his analysis with respect to Grounds A and B.  (Williams Dep. at 14:1-23).

## VI.     CLAIMS 1 AND 24 REQUIRE THAT THE "DIVERT[ING]" STEP OCCURS AFTER A MESSAGE HAS BEEN SENT FROM THE APPLICATION PROGRAM AND BEFORE THE MESSAGE IS RECEIVED AND CONTROLLED BY THE CONTROLLING ENTITY

The plain language of independent claims 1 and 24 clearly requires that the claimed "divert[ing]" limitation is an intervening step that must be performed after a message has been sent from the claimed application program and before the message is received and controlled by the claimed controlling entity.

27

For example, independent claim 1 of the '8923 patent recites a method for controlling application programs in a communication terminal, the method comprising:

> **sending messages from** <u>an application program</u> towards a communication network, the application program residing in a communication terminal;

> **diverting** <u>a message of</u> **the** <u>messages</u> **to a controlling entity** residing in the communication terminal; and

> **based on the message, controlling in the controlling entity** whether the application program behaves in a predetermined manner in the communication terminal, the controlling being performed before the message is transmitted from the communication terminal to the communication network.

(emphasis added).

In another example, claim 24 of the '8923 patent recites a terminal for a communication system, the terminal comprising:

> <u>an application program configured</u> **to send messages** <u>towards a</u> communication network; and

> <u>a diverting unit configured to</u> **divert** <u>a message of the messages</u> **sent from the application program** and destined for the communication network **to a controlling entity** residing in the terminal,

> wherein <u>the</u> **controlling entity is configured to control, based on the message** and before the message is transmitted to the

communication network, whether the application program behaves in

a predetermined manner in the communication terminal, and

wherein the terminal is a terminal of a communications system.

(emphasis added).

Thus, the plain language of independent claims 1 and 24 clearly require that

the claimed "divert[ing]" limitation is an intervening step that must be performed

after a message has been sent from the claimed application program and before the

message is received and controlled by the claimed controlling entity.

The Petitioner appears to agree with this analysis. For example, the Petition

bolded the following phrase of the specification of the '8923 patent in the section

describing the '8923 patent:

> At least some of the outbound messages generated by an application
> in a terminal **are diverted to the controlling entity** on their way from
> the application to the network.

See Petition at 6 *citing* the '8923 patent at 1:60-2:3 (emphasis added by Petitioner).

See also Petition at 14-15. In a similar manner, the Declaration of Dr. Williams

describes the disclosure of the '8923 patent as:

> <u>**After**</u> an application generates outbound messages, at least some of
> the generated <u>**messages are diverted to the controlling entity on**</u>
> <u>**their way from the application**</u> to the network. The controlling
> entity <u>**then**</u> evaluates the <u>**diverted message(s)**</u>.

See Declaration at 15 (emphasis added by Patent Owner).

However, as described in more detail below, the references cited in Grounds A and B fail to disclose an intervening step of "divert[ing]" a message to the claimed controlling entity where the "diver[ting]" of the message occurs after the message has been sent from the claimed application program and before the message is received and controlled by the claimed controlling entity.

## VII.  D'AVIERA DOES NOT ANTICIPATE THE CHALLENGED CLAIMS

### A.    D'Aviera Fails to Disclose the "Divert[ing]" Step as Required by Independent Claims 1 and 24.

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity.  Close scrutiny of D'Aviera, on the other hand, reveals that there is no disclosure of an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after the message has been sent from an application program and before the message is received by the claimed controlling entity.

The Petition and Declaration fail to even identify the structure or process capable of performing this intervening step of "divert[ing]" a message to the claimed controlling entity.  This deficiency in D'Aviera is highlighted by the

30

Petitioner having to rely on inherency as to where the claimed "diverting unit" is disclosed in D'Aviera. *See* Petition at 51; Declaration at Appendix B-1, 24-25. Rather, Petitioner attempts to circumvent this deficiency by pointing to the word "intercepts" to make conclusory arguments that the "divert[ing]" step is disclosed in D'Aviera. But these arguments fail because D'Aviera does not disclose, teach, or suggest the claimed intervening step of "divert[ing]" a message sent from the application program to the claimed controlling entity, as required by independent claims 1 and 24.

D'Aviera is directed to a system and method for controlling transmission of information using an isolator engine 225 that receives outbound operations of an application program 210 that is attempting to send messages to the Internet via a network module 220. *See* D'Aviera at Abstract; FIG. 2. D'Aviera's isolator engine 225 is a standalone application, the execution of which can be initiated by double clicking on an icon. *Id.* at 4:3-5.

The isolator engine 225 only analyzes messages from an application program 210 when the isolator engine 225 has been turned on by the user. *Id*. at 4:24-29; 5:3-12; FIG. 2. When the isolator engine is turned off, the messages from the application program pass through the isolator engine because the isolator engine is not listening for messages sent over the port number used by the application program. *Id*. Upon execution of the isolator engine 225, the isolator

engine 225 listens for messages sent over the same port number as used by the application program. *Id*. Thus, the isolator engine 225 receives all of the messages sent from the isolator engine 225, but the isolator engine 225 only analyzes the message when it is listening for messages sent over the same port number as used by the application program 210. *Id*.

To the extent that the isolator engine 225 could correspond to the claimed controlling entity, which Patent Owner disagrees, Petitioner has not shown where D'Aviera discloses the claimed intervening step of "**diverting** a message of the messages [sent towards a communication network] **to a controlling entity**," as recited in claim 1, or "**a diverting unit** configured to **divert a message of the messages** sent from the application program and destined for the communication network **to a controlling entity**," as recited in claim 24 (emphasis added).

As shown in FIG. 2 of D'Aviera, reproduced below, D'Aviera does not disclose anything between the application program 210 and the isolation engine 225 (i.e., the alleged controlling entity) that could perform the intervening "divert[ing]" step, as required by claims 1 and 24.



FIG. 2

As discussed above, to meet the claimed "divert[ing]" step, there must be something that "diverts" a message of messages after the message is sent from the application program and before the message is received by the controlling entity. For at least these reasons, D'Aviera cannot teach or suggest the claimed "divert[ing]" step.  Further, by pointing to the isolator engine 225 for both the diverting and control functions, the Petitioner vitiates the "divert[ing]" limitation.

### B.     Testimony of Petitioner's Technical Expert Confirms that D'Aviera Fails to Disclose the Diverting Step as Required by Independent Claims 1 and 24

As described above, the plain language of independent claims 1 and 24

clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity where the "divert[ing]" step is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity. The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below confirms that Petitioner is alleging that the interception module performs both the "diverting" step of a diverting unit and the "controlling" step of a controlling entity.

> Q.  What element or component in D'Aviera discloses the diverting step?
>
> A.  The isolator engine. The actions of the isolator engine.

(Williams Dep. at 24:4-7). *See also* Williams Dep. at 22:7-11.

> Q.  It's your opinion that the controlling entity is the isolator engine?
>
> A.  Yes.

(Williams Dep. at 25:23-25). *See also* Williams Dep. at 18:12-18.

The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below also confirms that Petitioner is alleging that the "divert[ing]" step only occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the isolator engine 225).

> Q.  So I'm asking, in D'Aviera, when are the messages diverted?
>
> THE WITNESS:  The messages are diverted once they enter block

225 and go through the process of the isolator engine, if at all.

Q.   So, in D'Aviera, the diverting step occurs after the messages are received by the isolator engine.

A.   After the messages enter block 225, yes[6].

(Williams Dep. at 23:9-10, 16-23).


Q.   The diverting step occurs after the isolator engine has received the messages, correct?

A.   Well, for diverting to occur, the diverting has to be performed on a message of the messages, so the diverting process has to have knowledge of a message of the messages, so, if I think I understand your question, the answer is yes.

Q.   So it's your opinion that the isolator engine determines whether or not the course of the message should be changed?

A.   Yes.  That's the thing that makes the decision of whether to, whether to divert the message or not.

(Williams Dep. at 24:11-23).


Q.   So the isolator engine determines whether or not to change the course of the message?

A.   Yes.  I think, I think of the claim as, in terms of brains and brawn. That brains are, is the decision-maker in terms of deciding whether to

---

[6] Block 225 is in reference to the isolator engine illustrated in Figure 2 of D'Aviera.

block the message, and then the controlling entity is the brawn, to

actually perform that operation.

(Williams Dep. at 25:14-20).

Dr. Williams' testimony acknowledges that the corresponding "divert[ing]" step in D'Aviera is not only performed by the alleged controlling entity (i.e., the isolator engine 225), but that the "divert[ing]" step in D'Aviera occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the isolator engine 225). The claims clearly require that the "diverting" step occurs prior to message being received by the controlling entity. Dr. Williams' testimony confirms that D'Aviera cannot disclose "divert[ing]" a message to a controlling entity, as recited in claims 1 and 24, because the alleged "divert[ing]" step in D'Aviera occurs after the message has already been received by the alleged controlling entity.

Further, claim 24 requires a diverting unit to divert a message to a separate controlling entity. Dr. Williams' testimony confirms that the diverting unit and the controlling entity are the same thing (i.e., the isolator engine 225), which provides additional evidence that D'Aviera cannot disclose, teach, or suggest the claimed "diverting unit" or the "diverting" step.

Thus, D'Aviera cannot possibly disclose, teach, or suggest "**diverting a message** of the messages **to a controlling entity**," as recited in claim 1, or "**a**

**diverting unit** configured to **divert a message of the messages** sent from the application program and destined for the communication network **to a controlling entity**," as recited in claim 24 (emphasis added).

## VIII.  CALDER IN VIEW OF RICHARDSON DOES NOT RENDER ANY OF THE CHALLENGED CLAIMS UNPATENTABLE

### A.  Calder and Richardson Fail to Disclose the "Divert[ing]" Step as Required by Independent Claims 1 and 24.

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity.  Close scrutiny of Calder and Richardson, on the other hand, reveals that there is no disclosure of an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after the message has been sent from an application program and before the message is received by the claimed controlling entity.

The Petition and Declaration fail to even identify the structure or process capable of performing this intervening step of "divert[ing]" a message to the claimed controlling entity.  This deficiency in Calder and Richardson is highlighted by the Petitioner having to rely on inherency as to where the claimed

"diverting unit" is disclosed in these references.  *See* Petition at 51; Declaration at Appendix B-1, 24-25.  Rather, Petitioner attempts to circumvent this deficiency by pointing to the word "intercepts" to make conclusory arguments that the "divert[ing]" step is disclosed by Calder and Richardson.  But these arguments fail because the Calder-Richardson combination does not disclose, teach, or suggest the claimed intervening step of "divert[ing]" a message sent from the application program to the claimed controlling entity, as required by independent claims 1 and 24.

Calder is directed to a method for virtualizing user interfaces and a system for securing an application for execution in a computer, using an interception module.  Calder at Abstract.  The interception module, which can be included in an application package 115, receives system calls that are made by the application program to the operating system, and acts as a "virtual layer" between the operating system and the application.  *Id*. at ¶¶ [0073] and [0098].  As shown in Calder's FIG. 4, reproduced below, an interception module, which is part of the virtual layer 415, intercepts part or all of the system calls made by the application 405 and provides virtual allocation and de-allocation routines 425, a virtualized registry 430, a virtualized files system 435, a virtual other environment 440, a virtualized network 445, and a virtualized graphics interfaces 450.  *Id*. at ¶¶ [0084]- [0085].

CASE IPR2014-01133
U.S. Pat. No. 7,218,923



FIG. 4

Petitioner asserts that "Calder discloses an 'interception module' that, like the <u>controlling entity</u> of the '923 Patent, prevents the application from behaving inappropriately and adversely affecting the operation of the computer."   Petition at 43 (emphasis added).  Petitioner further asserted that Calder inherently discloses a program for diverting messages [system calls] from application programs. Williams Declaration at ¶85."  Petition at 44.  Accordingly, it appears that Petitioners have characterized Calder's system calls as corresponding to the claimed messages sent towards the communication network and characterized

39

Calder's interception module as corresponding to the claimed controlling entity.

Petitioner has not explained how Calder inherently discloses a program for

"divert[ing]" system calls, as required by claims 1 and 24.

As shown in FIG. 4 of Calder, reproduced above, Calder does not disclose

anything between the application program and the interception module 415 (i.e.,

the alleged controlling entity) that could perform the intervening "divert[ing]" step,

as required by claims 1 and 24.  Rather, in Calder, the system calls are

preprogrammed to be sent from the application program to the interception module

(i.e., the alleged controlling entity).  *Id*. at ¶¶ [0076] ("The application package 115

is modified such that it communicates with an interception module."); ¶ [0070].

As discussed above, to meet the claimed "divert[ing]" step, there must be

something that "diverts" a message of messages after the message is sent from the

application program and before the message is received by the controlling entity.

For at least these reasons, Calder cannot teach or suggest the claimed "divert[ing]"

step.  Further, by pointing to the interception module for both the diverting and

control functions, the Petitioner vitiates the diverting limitation.

Patent Owner also notes that Calder's system calls cannot reasonably

correspond to the claimed messages sent towards the communication network.

Calder's system calls are made by the application program to the operating system

to request services from the operating system's kernel.  *Id*. at ¶ [0098].  Calder's

40

system calls are not configured for being transmitted through a communication network. System calls that are not organized and suitable for transmission through a communication network cannot reasonably correspond to the claimed messages sent towards the communication network.  For these additional reasons, Calder cannot teach or suggest, "sending messages from an application program towards a communication network," as recited in claim 1.

Richardson also cannot teach or suggest anything that could perform the claimed diverting step, and therefore fails to cure the deficiencies of Calder. Richardson does not cure the deficiencies of Calder.  In its Decision, the Board found that Richardson does not disclose the "divert[ing]" step, as recited in claims 1 and 24.  Further, the claims charts for the proposed Calder-Richardson combination submitted with the Petition and the Declaration do not provide any citations or explanation that Richardson could possibly disclose the claimed diverting unit.  *See* Petition at 51; Declaration at Appendix B-1, 24-25.

For at least these reasons, Calder and Richardson cannot render obvious claims 1 or 24.

### B. Testimony of Petitioner's Technical Expert Confirms that Calder and Richardson Fail to Disclose the Diverting Step as Required by Independent Claims 1 and 24

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed

41

controlling entity where the "divert[ing]" step is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity.  The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below confirms that Petitioner is alleging that the interception module performs both the "divert[ing]" step of a diverting unit and the "controlling" step of a controlling entity.

> Q.   So the interception module performs the diverting step and the controlling step?
>
> A.   Yes.

(Williams Dep. at 41:22-24).

> Q.   The interception module disclosed in Calder with regard to the diverting unit, and the interception module as disclosed in Calder with regard to the controlling entity, do those both refer to the same interception module in Calder?
>
> A.   Yes.  They are both disclosed in Calder by the interception module.

(Williams Dep. at 44:13-19).

> Q.   Other than the interception module, is there any other element in Calder that performs the diverting step?
>
> A.   Not that I've expressed an opinion on.

(Williams Dep. at 41:1-4).

The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below also confirms that Petitioner is alleging that the "divert[ing]" step only occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the interception module).

> Q.   I think we're on the same page but, just to clarify, the diverting step occurs after the interception module has received a system call?
> A.   Yes.  Again, the brains and the brawn.  The interception module receives the information from the application program via system call, and makes a decision based on that, and then the, the controlling entity makes the, is the brawn, makes the process of controlling, whether that message actually gets out to the outside network or not.

(Williams Dep. at 41:12-21).

> Q.   Is it your opinion that step 24B[7] occurs after the message that's received by the interception module?
> A.   Yes.  The interception module has to make decisions on and manipulate the message or the system call, so, of necessity, the information would have to be available to the interception module for it to do its task.

(Williams Dep. at 44:20-45:2).

---

[7] Step 24B refers to the "divert[ing]" step in Dr. Williams' claim chart addressing the Calder-Richardson combination.  *See* Declaration at Appendix B-1, 24-25.

Dr. Williams' testimony acknowledges that the corresponding "divert[ing]" step in Calder is not only performed by the alleged controlling entity (i.e., the interception module), but that the "divert[ing]" step in Calder occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the interception module).  The claims clearly require that the "divert[ing]" step occurs prior to message being received by the controlling entity.  Dr. Williams' testimony confirms that Calder cannot disclose "divert[ing]" a message to a controlling entity, as recited in claims 1 and 24, because the alleged "divert[ing]" step in Calder occurs after the message has already been received by the alleged controlling entity.

Further, claim 24 requires a diverting unit to divert a message to a separate controlling entity.  Dr. Williams' testimony confirms that the diverting unit and the controlling entity are the same thing (i.e., the interceptor module), which provides additional evidence that Calder cannot disclose, teach, or suggest the claimed "diverting unit" or the "divert[ing]" step.

Thus, Calder cannot possibly disclose, teach, or suggest "**diverting a message** of the messages **to a controlling entity**," as recited in claim 1, or "**a diverting unit** configured to **divert a message of the messages** sent from the application program and destined for the communication network **to a controlling**

44

**entity**," as recited in claim 24 (emphasis added).

Richardson does not cure the deficiencies of Calder.  In its Decision, the Board found that Richardson does not disclose the "divert[ing]" step, as recited in claims 1 and 24.  Further, the claims charts for the proposed Calder and Richardson combination submitted with the Petition and the Declaration do not provide any citations or explanation that Richardson could possibly disclose the claimed diverting unit.  *See* Petition at 51; Declaration at Appendix B-1, 24-25.

Thus, Petitioner has not sufficiently alleged, much less established, that Calder, either alone or in combination with Richardson, teaches each limitation of independent claims 1 and 24.

## IX.   CONCLUSION

For at least the reasons discussed above, none of the cited references in Grounds A and B disclose, teach, or suggest the claimed "divert[ing]" step, as recited in independent claims 1 and 24.  This deficiency in the cited references is confirmed by the cross-examination testimony of Petitioner's technical expert, Dr. Williams.  Therefore, Grounds A and B should be denied, and Patent Owner requests that the Board confirm the patentability of the challenged claims.

Petitioner also failed to meet the statutory requirement of identifying all real parties-in-interest, and the Decision should be vacated.

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

Respectfully Submitted,

Dated: May 15, 2015

*/s/ Barry J Bumgardner*
Barry J Bumgardner
Registration No. 38,397
John P. Murphy (*Pro Hac Vice*)
Attorneys for Patent Owner
NELSON BUMGARDNER, P.C.
3131 W. 7th Street, Suite 300
Fort Worth, Texas  76107
Telephone:  (817) 377-9111
Facsimile:  (817) 377-3485

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May 2015, a copy of Cellular

Communications Equipment LLC's Response has been served in its entirety by

electronic mail on the following:

| | |
|---|---|
| Steven Moore<br>Richard Thill<br>PILLSBURY WINTHROP<br>SHAW PITTMAN LLP<br>steve.moore@pillsburylaw.com<br>richard.thill@pillsburylaw.com | William Barrow<br>Baldine Paul<br>Robert Pluta<br>Amanda Streff<br>MAYER BROWN LLP<br>wbarrow@mayerbrown.com<br>bpaul@mayerbrown.com<br>rpluta@mayerbrown.com<br>astreff@mayerbrown.com |
| Alan Wright<br>Steve B. Kelber<br>Nathan Cristler<br>H.C. PARK & ASSOCIATES, PLC<br>awright@park-law.com<br>skelber@park-law.com<br>ncristler@park-law.com | |

Dated: May 15, 2015                    Respectfully Submitted,

*/s/ John P. Murphy*
John P. Murphy
Attorney for Patent Owner
NELSON BUMGARDNER, P.C.
3131 W. 7th Street, Suite 300
Fort Worth, Texas  76107
Telephone:  (817) 806-3808
Facsimile:  (817) 377-3485

47