# EXHIBIT C

Case 6:16-cv-00363-KNM   Document 62-4   Filed 02/16/18   Page 2 of 66 PageID #: 1084
IPR2014-01133, Paper No. 47
trials@uspto.gov
571-272-7822
December 3, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

PANTECH CO., LTD

Petitioner

v.

CELLULAR COMMUNICATIONS EQUIPMENT LLC

Patent Owner

————————————————

IPR2014-01133
Patent No. 7,218,923

————————————————

Held: AUGUST 26,2015

————————————————

BEFORE: Judge Jennifer S. Bisk , Administrative Patent Judge

APPEARANCES

FOR THE PATENT OWNER

MR. BARRY J. BUMGARDNER
-and-
MR. JOHN MURPHY
NELSON BUMGARDNER
3131 West 7th, Suite 300
Fort Worth, Texas  76107
(817) 377-3494
barry@nelbum.com
murphy@nelbum.com

FOR THE PETITIONER
MR. MICHAEL MAAS
MAYER BROWN, LLP
1999 K Street, N.W.
Washington, D.C.  20006-1101
(202) 263-3138
mmaas@mayerbrown.com

-and-

MR. ROBERT G. PLUTA
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, Illinois  60606-4637
(312) 701-8200
rpluta@mayerbrown.com

P R O C E E D I N G S

1        JUDGE BISK:  Good evening.  This is a trial

2  hearing for IPR2014-01133 challenging U.S. Patent No.

3  7,218,923.

4        As you know, each party has 30 minutes to

5  present their argument.  Petitioner will speak first,

6  followed by patent owner.  Petitioner may elect to

7  reserve some of their time for rebuttal.

8        At this time we'd like Counsel to introduce

9  themselves and who you have with you starting with

10  Petitioners.

11        MR. MAAS:  Thank you, Your Honor.  I'm

12  Michael Maas with Mayer Brown.  I represent LG

13  Electronics and LG Electronics U.S.A.

14        MR. PLUTA:  Robert Pluta with Mayer Brown.

15        MR. MURPHY:  Yes, Your Honor.  This is John

16  Murphy representing the patent owner from Nelson

17  Bumgardner.  And with me I have Barry Bumgardner.  Thank

18  you.

19        JUDGE BISK:  Okay.  Whenever you are ready.

20        MR. MAAS:  May it please the Board.  We'd

3

1    like to reserve 15 minutes for rebuttal.

2            JUDGE BISK:  Okay.

3            MR. MAAS:  The Board instituted this IPR --

4    the Board instituted this IPR on two grounds:  D'Aviera  and Calder and Richardson.  In

5     doing so, the Board relied

6    on isolator engine, as well as D'Aviera, as satisfying

7    two claim limitations under Claims 1 and 2, and that is

8    the diverting limitation and the controlling limitation.

9            Similarly, with respect to Calder, the

10   Board relied on two limitations.  Relied on interception

11   model of Calder to satisfy the two limitations of the

12   same limitations.

13           The Board's decision is -- is consistent

14   with federal circuit precedent, the disclosures in

15   D'Aviera and Calder and the sworn declaration of

16   Petitioner's expert.  Today the patent owner challenges

17   whether the isolator engine and interceptor module can

18   be relied upon to satisfy two limitations that they

19   maintain can only be used to satisfy the controlling and

20   the -- the controlling limitation.

4

1          That is contrary to federal circuit

2     precedent.  That is contrary to the disclosures of

3     D'Aviera and Calder, and that is contrary to the

4     declaration of Petitioner's expert.

5          They have not submitted -- they have not

6     submitted law in support of their argument.  They have

7     not submitted an expert declaration in support of their

8     argument.  Instead they would have -- they rely on

9     attorney's argument.

10          In contrast to the absence of evidence

11     offered by patent owner, the petitioner has -- the

12     petitioners have identified portions of D'Aviera and

13     Calder that disclose the limitations in question,

14     submitted their report file, submitted the expert

15     testimony in support of their contentions.  In absence

16     of countervailing evidence from the patent owner,

17     Petitioners have clearly met their burden of proof

18     demonstrating that the claims are unpatentable by a

19     preponderance of the evidence.

20          Move to slide two.

1        Of the challenged claims, two of them are

2    independent.  There's Claim 1 and Claim 24.  They're

3    very similar.  Claim 1 is a method claim.  Claim 24 is

4    an apparatus claim.  Limitations are very similar, so

5    I'm just going to walk through the Claim 1 very quickly

6    because I know you're familiar with the claims.

7        Both the claims are directed towards the

8    communication that we have in terminals.  The terminals

9    have applications of said messages to the -- to the

10   network.  The claims require a diverting of a message --

11   a message -- of the messages sent by the application to

12   the network.  The diverted messages are sent to the

13   controlling entity which also resides on the terminal.

14        JUDGE WEINSCHENK:  Did you agree with the

15   patent owner's interpretation that this diverting step

16   needs to be performed before the controlling step?

17        MR. MAAS:  We agree that it must be

18   performed before the controlling step, yes, sir.

19        JUDGE WEINSCHENK:  So you do agree that the

20   order of the steps here is -- is a limitation on the

1    claims?  The diverting has to happen, then the

2    controlling?

3         MR. MAAS:  We -- we agree with that, Your

4    Honor.  And the reason we do is the claim language

5    requires the message be diverted to the controlling

6    entity.

7         And so after the messages got diverted to

8    the controlling entity, the controlling entity controls

9    whether it makes a decision about that message.  It

10   decides whether that message can go out the network or

11   if it must -- must be modified somehow or -- or -- for

12   example, perhaps, it even says that the message can't go

13   out to the network and retains it.

14        Then, again, I'd just walked through Claim

15   1, but Claim 24 is very similar.  I'll spare us going

16   through that.

17        Patent owner -- the patent owner's

18   arguments have -- have -- were raised in preliminary

19   response, and they were properly rejected.  The --

1    that -- to require federal circuit precedent, which we

2    cited -- if we could go to Slide 34.  Federal circuit

3    precedent is clearly held that -- that the same element

4    of prior art can be relied on to satisfy more than one

5    claim limitation.  There is no need to engage in

6    arbitrary box drawing and exercise on -- the -- the

7    limitations in Calder and D'Aviera -- the elements in

8    Calder and D'Aviera -- the isolation is in the -- the

9    interception module performed both the diverting

10   function and they perform the controlling function.

11            JUDGE WEINSCHENK:  Are you saying two --

12   two separate aspects of that isolator engine is

13   performing the different steps, or are you saying the

14   same function performs both things?

15            MR. MAAS:  I'm saying the different -- I'm

16   not -- the same function -- excuse me, Your Honor.  I'm

17   saying that different aspects of the isolator engine and

18   different aspects of the interceptor module would

19   perform the -- the diverting step and different --

20   and -- and the controlling step.  We're not saying that

1    the controlling step is the diverting step.

2         JUDGE WEINSCHENK:  So you're saying that

3    within the box, for example, you've shown here the

4    isolator engine, there's separate things that do each of

5    these steps in -- in the order recited in the claims?

6         MR. MAAS:  Yes, that -- as we walk

7    through -- as we walk through the references, the

8    isolator block in D'Aviera -- well, it's describing

9    D'Aviera very clearly as an intercepting message.  It's

10   also clearly described as controlling that message after

11   the interception has determined whether or not it will

12   be sent out to the communications terminal.  So even

13   though it's not -- even though the -- D'Aviera didn't

14   break it up neatly with all -- two discreet blocks

15   labeled "diverting" and "controlling," they clearly

16   describe it as performing the two functions, which --

17   which results -- which necessitates that there must be

18   at least two algorithms as part of that block performing

19   the functions.

20        JUDGE WEINSCHENK:  In D'Aviera do all of

1    the messages go to the isolator engine?  I think this is

2    one of the patent owner's points.  How could it be

3    diverted if the isolator engine is sort of the intended

4    destination of the message?

5         MR. MAAS:  I believe that it describes

6    preferred (unintelligible) that they're all -- that

7    they're all diverted, and it describes how it's

8    diverted.  It describes -- and it's set forth in the

9    expert declaration, but it describes how the diverting

10   occurs in the hook -- I think it says it uses the hook

11   method where isolation is listed on the port that's

12   assigned to the application --

13        JUDGE WEINSCHENK:  So is it -- is it your

14   position that even if the isolator engine takes every

15   single message, that's still diverting?

16        MR. MAAS:  That -- that is still our

17   position.  Diverting, as the word is construed, means

18   just changing the course -- the intended course of the

19   message.  If the application sends out the message,

20   intend that it to go to the network, and the isolation

10

1    engine intercepts it, then it does it for -- it has the

2    change of course.  If it does it for each of the

3    messages that the application -- or -- or every

4    application on the terminal has a change of course, each

5    and every one of those.

6            And so -- and then federal circuit -- and

7    I'm not going to walk through these cases, but the

8    federal circuit precedence is clear that we can rely on

9    the same element the prior art referenced to satisfy the

10   two claim limitations.  And the patent owner has cited

11   no cases to -- in support of its requirement that --

12   that there has to be two different boxes in D'Aviera or

13   Calder.

14           And I'll just quickly go through both the

15   D'Aviera -- go through D'Aviera.  D'Aviera clearly

16   describes the isolator -- the isolation engine patents

17   performing these two functions:  diverting and the

18   control.

19           If we could go to slide 14.

20           In slide 14 -- and this is a cite from

1    Exhibit 1008, which is D'Aviera column -- page 3, line

2    21 through 24, and it's clearly describing the -- the

3    isolation engine is intercepting -- intercepted

4    information to be sent from the terminal to the network.

5    It says, "On the other hand, information to be sent to

6    the Internet is intercepted by an isolator engine,

7    (Isolator) 225, which in turn retransmits the

8    information to the network module 220.  So it's sent out

9    directly to the Internet, the isolation engine

10   intercepts it, it retransmits it, if appropriate, as

11   well it turns to the next limitation connection, decline

12   to retransmit.

13         Go to slide 15.

14         In slide 15, again, this is a quotation

15   from the D'Aviera, page 3 -- page 3, lines 25 to 29,

16   describing that D'Aviera -- the isolation engine has a

17   privacy -- has privacy list, and it determines whether

18   or not, depending on whether that message meets the --

19   the -- falls within that list or not, to send that

20   message on.  If it falls within the privacy list, the

1     message is sent on.  That's cited in our petition on

2     page 36 of the Williams' declaration that -- at pages 3

3     and 4.

4                And patent -- you should note that patent

5     owner's position is contrary to the testimony of the

6     only expert testimony before us.  They had the

7     opportunity to submit their own expert declaration in

8     their response.  They declined to do so.  So

9     Dr. Williams is the only one that submitted sworn

10    testimony to explain that -- this from a technical

11    standpoint.  The isolation is -- is performing these two

12    functions and satisfying these two claim elements.

13                And just to help the Board's decision,

14    the -- the arguments we presented by the -- the -- by

15    the patent owner were presented in preliminary response,

16    and they were correctly rejected by the Board.  It's an

17    institution decision, and nothing has changed since that

18    institutional decision.  There's no -- they did not

19    submit an expert declaration.  There's no new case law.

20                JUDGE BISK:  I noticed that the patent

13

1    owner hasn't cited any case law, but at this point the

2    functions have to be -- they have to have different

3    elements, but there are federal circuit cases that do

4    find -- find that way.  So there's -- there's a case

5    called Becton, Dickinson where a claim list elements

6    separately.  The clear explanation of the claim language

7    is that those elements are distinct components of the

8    patent invention.  And then it goes on to not find

9    anticipation by one element in the -- in the prior art

10   reference.

11          So what I'm wondering is in D'Aviera can

12   you -- can you point to something that shows that the

13   isolator between those two distinct things separately,

14   that the -- the -- the -- in determining control -- or

15   the diverting and then controlling?  Is there any

16   disclosure of that?

17          MR. MAAS:  Well, the --

18          JUDGE BISK:  Or just -- are you just saying

19   that because it does those two functions, it does them

20   separately?

1          MR. MAAS:  It -- it -- would you go back to

2     slide 2.  Basically, that is our argument.  D'Aviera

3     teaches that the -- teaches that messages -- that it

4     intercepts messages.  It describes -- it's in the expert

5     declaration, but it describes how it intercepts using

6     the hook method.  So it -- that -- in order to get it to

7     the controlling entity, which is also in the isolator

8     engine, it first has to have a message.

9          JUDGE BISK:  So how do we know it's

10    different?  Do you -- do you call it a different entity?

11    Is there language in D'Aviera that discusses those

12    different entities?

13         MR. MAAS:  Well, D'Aviera discusses it as

14    just a single block.  That's one of the -- that's the

15    reason we -- it's -- our expert opined that it was

16    inherent that there be another program in D'Aviera and

17    the isolator -- isolation engine which would perform on

18    this function because D'Aviera would have to be --

19         JUDGE BISK:  So we just -- so we just have

20    the expert testimony?  There's nothing in disclosure --

15

1          MR. MAAS:  We have the --

2          JUDGE:  -- specifically?

3          MR. MAAS:  We have the undisputed expert

4     testimony that -- that it's inherent in the isolation

5     engine, and we also, just as a matter of law, think it's

6     performing two different functions; therefore, it would

7     need -- it would need two different algorithms, at the

8     very least, to perform each function.  The intercepting

9     is not the controlling.  If it was -- if -- if it can

10    intercept every message, it would intercept every

11    message that didn't perform any controlling function,

12    then it would certainly -- the purpose -- all those

13    messages would just go out and be retransmitted.  But,

14    in fact, it has -- if you go to slide 15.

15          JUDGE WEINSCHENK:  If you just want to lean

16    down a little bit into the mic so that people can hear

17    you.  I think it's not really -- it can't go any higher,

18    but it might pick you up a little better if you at

19    least --

20          MR. MAAS:  Sorry.

1          JUDGE WEINSCHENK:  Yeah, that's better.  I

2    mean, we can hear you, but some folks sitting in the

3    back so. . .

4          MR. MAAS:  So we go up with D'Aviera

5    controlling -- controlling aspect, there's a definite

6    privacy list which is unrelated to the interception of

7    the messages.  This occurs after -- or it has acquired

8    the message and it's going out and it's being compared

9    to the privacy list.  So -- so there -- there are two

10   distinct functions that this block is performing.  And

11   as our expert opined, again unrebutted, that there --

12   there needs to be a program to perform that diverting

13   step.

14         JUDGE ANDERSON:  What about this point that

15   the patent owner raises that your expert testified that

16   the actual diverting occurs after the controlling entity

17   receives the message and analyzes it, which is -- you

18   just said a few minutes ago is the inverse of what the

19   claim requires?

20         MR. MAAS:  Yeah.  Again, that -- you know,

1    snippets from the deposition hardly captures the whole

2    meaning of his testimony.  But the -- I think the

3    central part of some of the confusion is that even

4    though we have this separate interception step, which is

5    the claim diverting step, when we get to the controlling

6    step, the -- the isolation engine can decide whether or

7    not that message goes on to the network, and that can

8    also be seen as another diverting step.  I think there's

9    some confusion with that.

10         JUDGE WEINSCHENK:  So you're saying that --

11   oh, I'm sorry.  Go ahead.

12         JUDGE ANDERSON:  No.  No.  You got it.  Go

13   ahead.

14         JUDGE WEINSCHENK:  Are you saying that your

15   expert is really talking about the controlling step when

16   he was saying diverting?

17         MR. MAAS:  Sometimes -- sometimes he was

18   talking about diverting in the deposition and sometimes

19   he was talking about -- he was referring to the

20   controlling step?

18

1          JUDGE WEINSCHENK:  Okay.  How do we know

2     which one he's talking about?

3          MR. MAAS:  It's clear from his -- from his

4     declaration which one he's talking about.  He's -- he's

5     very thoughtful in underlying the language.  If we turn

6     to -- I believe it's -- Appendix A(b)2.

7          Apologize, Your Honor.

8          JUDGE BISK:  I'm sorry.  You're running

9     into your 15-minute rebuttal time.

10         MR. MAAS:  All right.

11         JUDGE BISK:  You need to decide what you're

12    going to do.

13         MR. MAAS:  I'll -- I'll -- thank you, Your

14    Honor.  I'll continue to respond to the question.

15         So we have 24(b) of -- this is the -- one

16    of the independent claims, and that's the diverting unit

17    of 24(b).  And so our expert -- and, sorry, let me get

18    to the page.  And so this is part of the -- well, the

19    portion of D'Aviera that he cites in support of -- of

20    the -- the diverting unit be disclosed, and it's clear

1    that he's relying on the -- the portion of D'Aviera

2    which describes the isolator engine as intercepting

3    messages that are being sent by the application and then

4    it retransmits.

5              JUDGE WEINSCHENK:  So are you saying that

6    we should sort of look past the deposition testimony

7    where he got confused and just rely on his declaration?

8    Because it seems he -- he may have contradicted himself

9    a bit.

10             MR. MAAS:  There is absolutely no

11   contradiction.  He was implying the diverting as

12   construed by the court, which wasn't change -- changing

13   course of the message.  If the message is -- is held by

14   the controlling, then it's diverted too.  So there was

15   no inconsistency with his testimony.

16             JUDGE WEINSCHENK:  You're saying it's

17   diverted twice?

18             MR. MAAS:  In that instance it is.  It --

19   the '923 patent talks about various different ways to

20   control the message.  It talks about even modified

1      message.  D'Aviera doesn't modify messages.  But it also

2      talks about retaining -- preventing the message from

3      going out.

4              JUDGE WEINSCHENK:  So you're saying the

5      controlling can be a second diversion by it saying it

6      doesn't go to the Internet?

7              MR. MAAS:  Yes.  But there has to be a

8      first diversion to get to the controlling entity or the

9      controlling entity won't be able to do that.

10             JUDGE WEINSCHENK:  And you're saying that

11     the -- the portions of your expert's deposition the

12     patent owner refers to is really talking about the

13     diversion that occurs as part of the controlling step?

14             MR. MAAS:  Yes.

15             JUDGE WEINSCHENK:  Okay.

16             MR. MAAS:  If there are any more questions,

17     I'll be glad to answer them.

18             JUDGE BISK:  Okay.  Thank you.

19             MR. MAAS:  Thank you.

20             MR. MURPHY:  Your Honor, I would like to

1   start with slide 21.  I don't know if there's an issue

2   here.  It sounds like we're in agreement about what the

3   claim requires.  The diverting limitation is an

4   intervening step.  It's performed after a message has

5   been sent from the claimed application program but

6   before the message is received by the claimed

7   controlling entity.  So unless you have some other

8   questions about the order of these steps, then I'll move

9   on to the next section.

10          Here's another excerpt on slide 23.  Within

11  the expert declaration, he also seems to agree with this

12  required ordering of the step.  "After an application

13  generates outbound messages, at least some of generated

14  messages are diverted to the controlling entity on their

15  way -- on their way from the application to the network.

16  The controlling entity then evaluates the diverted

17  messages."

18          As the Board is aware, in their claim

19  construction, you construe the term "diverting" to be

20  "changing the course of" and "divert" to be "to change

22

1    the course of."  In the context of the claims, this will

2    require some intervening step before it reaches the

3    controlling entity for the message to have its course

4    changed.

5            JUDGE WEINSCHENK:  Does patent owner agree

6    with that construction?

7            MR. MURPHY:  Patent owner has no stance on

8    that construction.

9            I think part of the problem here, as you

10   can tell, the petitioner instructs to articulate exactly

11   what the diverting step was.  It's certainly not

12   disclosed in D'Aviera itself.  Essentially relies on the

13   expert declaration only.

14           JUDGE WEINSCHENK:  No.  No.  Why -- why --

15   why doesn't the portion of -- D'Aviera says it

16   intercepts the message.  Why isn't that a diversion?

17           MR. MURPHY:  First of all, it just uses the

18   word "intercepts."  If you read between the lines what's

19   actually going on, this is a standalone application

20   program.  The isolator engine, when it's turned on, a

1    separate register will turn on that will say "I'm going

2    to listen to a certain port number."  When the isolator

3    engine is not turned on, it will not listen to that port

4    number.

5          So the hooking technique in the

6    intercepting that's occurring, there's nothing that

7    happens between the application program and the isolator

8    engine.  The only thing that occurs, with any type of

9    logic, is only after it's received by the isolator

10    engine.  And there it just simply stops the message.

11          JUDGE WEINSCHENK:  And I guess the question

12    is, what about the part that says the application sends

13    a message to the network and the isolator engine

14    intercepts that?  That seems to me to be it's intended

15    to go to the Internet, and then it changes course by the

16    isolator engine intercepting that.  Why does that not

17    teach a diversion?  I understand that -- that maybe it

18    diverts all of the messages, but -- is that your point?

19    That if you divert all of them, there's not a diversion

20    anymore?

24

1               I'm struggling to understand what -- what

2      your -- what your argument is about that portion.

3               MR. MURPHY:  Sure.  Our argument is there's

4      no disclosure in D'Aviera between the alleged

5      controlling entity, which is the isolator engine, and

6      after the application program.

7               JUDGE WEINSCHENK:  So you're -- you're just

8      arguing that there's -- something separate needs to be

9      there apart from the isolator engine?

10              MR. MURPHY:  Yes.  Just like it sounds like

11     the petitioner and the patent owner agree on the

12     diverting stuff occurs after the application program

13     sends a message and before --

14              JUDGE BISK:  So why --

15              MR. MURPHY:  -- the message is converted --

16     I'm sorry.

17              JUDGE BISK:  -- (unintelligible) two

18     separate blocks on the -- on the diagram there?

19     There -- there are federal circuit cases that seem to go

20     two -- both ways on claims where there are multiple

1    elements, whether it has to be in the prior art or

2    whether it has to be also multiple -- multiple elements.

3    Why in this case does it have to be multiple elements,

4    and why can't it be all in that one box?

5           MR. MURPHY:  I'll go back to the claim

6    language on slide 21.  Here "an application program is

7    configured to send messages."  That's the first step.

8    Then after the message is sent from the application

9    program, there's "a diverting unit configured to convert

10   a message of the messages sent from the application

11   program to a controlling entity."  Therefore, the

12   diversion step has to occur before the message is

13   received by the alleged controlling entity.  And here

14   D'Aviera does not disclose that.

15          So if you want to focus on the second

16   limitation here --

17          JUDGE BISK:  Can you go back --

18          MR. MURPHY:  Sure.

19          JUDGE BISK:  So you're --

20          MR. MURPHY:  So --

1            JUDGE BISK:  So you're saying that the

2    diverting unit has to separately send it to the

3    controlling entity?

4            MR. MURPHY:  Yes, Your Honor.

5            JUDGE BISK:  Is there a separate setting in

6    there?

7            MR. MURPHY:  Yes, Your Honor.  I think

8    it's -- I think it's clear from the claim language here

9    just by looking at the underlying language where "a

10   diverting unit is configured to convert a messages of

11   the messages sent from the application program to a

12   controlling entity."

13           JUDGE BISK:  But it contains the point it's

14   sent to the subscribing areas from the application

15   program.

16           MR. MURPHY:  Correct.  So messages that are

17   sent from the application program are sent.  The

18   diverting unit then diverts those messages sent from the

19   application program to a controlling entity.

20           JUDGE BISK:  And why can't the controlling

1    entity and the diverting unit be in the same block on

2    the -- on the figure?

3         MR. MURPHY:  Well, I think it would render

4    the claim nonsensical if you have to divert a message to

5    something that it already was itself.

6         So, I mean, if we were to put an isolator

7    engine -- or if we were going to substitute the word

8    "diverting unit" for "isolator engine," it would read an

9    application program configured to send messages, and an

10   isolator engine will be configured to divert a message

11   of the messages sent from the application program to an

12   isolator engine.  So how can one thing do both?

13        JUDGE BISK:  Well, to me, I'm reading

14   that -- that claim element limitation there as diverting

15   away from the communication network, so it doesn't

16   matter to me where it diverts it to.  It could divert it

17   to itself.  It's still -- it's being diverted away from

18   its destination of the communication network.

19        MR. MURPHY:  I read it as to say the

20   message is destined to the communication network.

28

1          JUDGE BISK:  Right.

2          MR. MURPHY:  But it's diverted to a

3    controlling entity.

4          JUDGE BISK:  Right.  And -- and why

5    can't -- why can't that controlling entity also be the

6    diverting entity?

7          MR. MURPHY:  That's here.  If you look at

8    the box, we're considering the isolator engine as the

9    controlling entity.  Something before the controlling

10   entity has to divert the message to the controlling

11   entity.  So there has to be a similar type of logic box

12   somewhere between the application program and the

13   isolator that has the capability to divert a message

14   before it reaches the controlling entity.

15         Turn to slide 29.

16         In petition and Petitioner's decla --

17   expert declaration, it was very unclear of what they

18   were even alleging the diverting unit was.  They never

19   cited that the isolator engine or the interception

20   engine was the diverting unit.  They just cite the --

1    why it's squashed from the patent, the prior art, and it

2    was left to us to try and figure out what they were

3    alleging.

4         In Petitioner's expert declaration, he

5    claims -- this is a conclusory statement.  He says,

6    "D'Aviera's inherently discloses a program for diverting

7    messages from application program.  They don't ever cite

8    the -- where this program is, why isn't it inherent,

9    where is it located between the application program and

10   the controlling entity, and -- they don't show any of

11   that.

12        Now, as you mentioned in the

13   cross-examination, Petitioner's expert clarifies for us

14   for the first time that they were reading the

15   interception module of D'Aviera performed both the

16   diverting step and the controlling step.

17        And here we get into some deposition

18   testimony that you were asking the petitioner about.

19   Here we think it's clear from the record, from the

20   deposition testimony, that to the extent that they are

1   alleging that there is a diverting unit, they're clearly

2   saying that the diverting unit -- the diverting doesn't

3   happen until after the message is received by the

4   controlling entity.  Which, as Petitioner has agreed to

5   earlier, they agreed that a diverting step must occur

6   before the controlling step.

7        Here they say we mischaracterized his

8   testimony.  I'll say that if we mischaracterized his

9   testimony, why did Petitioner not go forward with a new

10  declaration for the expert to clarify his testimony?

11       JUDGE BISK:  So you're asking why didn't he

12  put in a new declaration when they replied?

13       MR. MURPHY:  Correct.

14       JUDGE BISK:  Okay.

15       MR. MURPHY:  So here I think there's blocks

16  of text listed throughout the response, and -- and the

17  slides are clear that -- "The diverting step occurs

18  after the isolator engine has received the messages,

19  correct?"

20       It's very clear, "Well, for diverting to

1    occur, the diverting has to be performed on a message of

2    the messages, so diverting process has to have knowledge

3    of a message of the messages, so, if I think I

4    understand your question, the answer is yes."

5        "So it's your opinion that the isolator

6    engine determines whether or not the course of the

7    message should be changed?"

8        "Yes.  That the thing that makes the

9    decision of whether to -- whether to divert the message

10   or not."

11       JUDGE WEINSCHENK:  How do you respond to --

12   to Petitioner's argument that his testimony is really

13   referring to the controlling step and not the diversion

14   step?  There's some confusion about what the expert was

15   actually talking about?

16       MR. MURPHY:  Well, I mean, if you look at

17   slide 32, for example -- "So I'm asking, in D'Aviera,

18   when are the messages diverted?"

19       "The messages are diverted once they enter

20   block 225," which is the isolator engine.  So he's

1   saying they're not diverted until after they've already

2   entered the isolator engine and go through the process

3   of the isolator engine, if at all.

4        Another question:  So, in D'Aviera, the

5   diverting step occurs after the messages are received by

6   the isolator engine?"

7        "After the messages enter 225, yes."

8        In 225, as you can see from Figure 2, it

9   diverts to the isolator engine.

10       JUDGE WEINSCHENK:  I think what

11  Petitioner's argument is is that there's a -- there's a

12  first step where it intercepts the message, which is

13  the -- technically the diverting step, and there's

14  something that -- where it has to control what happens

15  to that message, and they say one way of controlling it

16  would be diverting it somewhere other than it's intended

17  to be.  Diverting, again, meaning not letting it go to

18  the Internet.  Do you agree with their characterization

19  of that testimony, or do you think it's something

20  different?

1          MR. MURPHY:  No, I don't agree with that

2    characterization of the testimony at all, Your Honor.

3          I mean, here (unintelligible) the context

4    as when we're talking about it.  If you look at it as a

5    whole as to the deposition testimony, the transcript,

6    it's very clear I'm talking about the diverting step.

7    Step 24B or Step 1B.

8          Here I'm also using -- my question's the

9    claim construction of what diverting is.  "So the

10   isolator engine determines whether or not to change the

11   course of a message"?

12         The slide before that, slide 33, "So it's

13   your opinion that the isolator engine determines whether

14   or not the course of the message should be changed?"

15         So, then, if you go through -- jump ahead

16   to Calder, he had very similar testimony on that.  And

17   there it's very clear some of the questions were

18   actually asking about Step 24B.  Questions are crystal

19   clear it's talking about the diverting step and not

20   talking about the controlling step.

1          "Is it your opinion that step 24B occurs

2    after the message that's received by the interception

3    module?"

4          Step 24B under the claim chart refers to

5    the diverting unit.

6          "Yes.  The interception module has to make

7    decisions on and manipulate the messages or the system

8    call, so, of necessity, the information would have to be

9    available to interception module for it to do its task."

10          That's an example where, you know, it's

11    crystal clear on the actual question, but I think if --

12    Your Honor, if you review the deposition testimony and

13    the surrounding questions around it, it's pretty clear

14    that we're talking about the diverting step and not the

15    controlling step.

16          So here we have a sum-up for D'Aviera, and

17    I think there's two big points.  One:  It's our position

18    that D'Aviera has no disclosure on the diverting step of

19    an intervening step that occurs after a message has been

20    sent from the application program and before the message

35

1    is sent to a controlling entity.  We don't think there's

2    any disclosure of that at all in D'Aviera.

3         Two:  To the extent that, you know, they

4    want to allege that there is a diverting step, I think

5    their expert made it clear that the diverting step -- if

6    there is a diverting step -- doesn't occur until after

7    it's already reached the controlling entity.

8         JUDGE ANDERSON:  You're good with the

9    construction change course of to change the course of or

10   divert?

11        MR. MURPHY:  Yes, Your Honor.  For the

12   purposes of this proceeding, we don't have any issues

13   with that construction.

14        MR. MURPHY:  The other ground that this

15   was -- well, before I move on, Your Honor, would you

16   like to talk anymore about D'Aviera?

17        JUDGE WEINSCHENK:  Nothing from me on it.

18        MR. MURPHY:  I think Calder and Richardson

19   has the exact same issues with it.  So if you can flip

20   through those, I think the arguments are going to be the

1    same.  So if you have any actual questions about

2    Calder/Richardson, please let us know.

3          So here, this is a combination of

4    Richardson and Calder.  Slide 38's clear Richardson --

5    first of all, the Board rejected Richardson on its own

6    not disclosing the diverting step.  And, second of all,

7    Petitioner's claim charts for the proposed

8    Calder-Richardson combination, they didn't provide any

9    citations from Richardson that disclosed the converting

10   unit, and their reply didn't seem like they had any

11   issue with Richardson filling in the gaps for Calder.

12   So, again, I think for the same issues with D'Aviera as

13   Calder, "Calder fails to disclose intervening diverting

14   step performed after a message has been sent from the

15   claimed application program and before the message is

16   received by the claimed controlling entity."

17         And here I think this is a clear statement

18   from Calder as to what's really going on in Calder.

19   "The application package is modified such that it

20   communicates with an interception module."  So similar

1    to D'Aviera, a message is always sent to the controlling

2    entity.  Here the alleged controlling entity is an

3    interception module.

4            JUDGE WEINSCHENK:  Does it matter if all

5    messages are sent to the interception module?  I think

6    we talked about this before, and I guess I'm not sure

7    what your position is.  Does something less than all of

8    the messages have to go there in order for it to be

9    diverted, or can all the messages be diverted?

10           MR. MURPHY:  Your Honor, all the messages

11   can go there, but there has to be some -- it's our

12   position there has to be some logic between the

13   application program and the controlling entity.  There's

14   some of type of logic, some type of analysis "Do I need

15   to convert this message to the controlling entity?"

16           JUDGE BISK:  Why logic?  What -- what in

17   the claim construction --

18           MR. MURPHY:  Oh, logic or function or

19   structure.  There needs to be something between -- after

20   the message is sent from the application program, before

1    it's received by controlling entity, there has to be

2    something that's capable of performing, you know,

3    changing the course of the message basically by

4    rerouting it to the divert -- to the controlling entity.

5              I think the petitioner will struggle – I

6    mean, and bring up in rebuttal time, I'd love to see,

7    like, explicit disclosure from Calder or from D'Aviera

8    that does show this intervening step of the diversion

9    happening after a message is sent from the application

10   program and before it's received by the controlling

11   entity.  I think they really struggle with that, and

12   they can't point to anything.

13             And then, again, this is another example as

14   to it seems like they're struggling to figure out what a

15   diverting unit could be in these references and really

16   struggled with it.  So in their expert declaration, he

17   says that "Calder further inherently discloses a program

18   for converting messages from application programs."

19   They weren't able to point to anything.  He wasn't able

20   to explain why it was inherent.  He wasn't able to

1    explain where this inherent diverting occurred.  He just

2    has a conclusory statement in there saying that Calder

3    further inherently discloses a program for diverting

4    messages from the application program.

5          Then, again, we get into his testimony

6    regarding, you know, at what point does the diverting

7    step occur.

8          So I ask my question:  "I think we're on

9    the same page, but just to clarify, the diverting step

10   occurs after the interception module has received a

11   system call?"

12         And here they're interpreting system call

13   as a message.

14         "Yes.  Again, the brains and the brawn.

15   The interception module receives the information from

16   the application program via system call, and makes the

17   decision based on that, and then the controlling entity

18   is the brawn, and it makes the process of controlling

19   whether that message actually goes to the outside

20   network or not."

1              This is another example he knew exactly

2       what the difference was between diverting and

3       controlling because he's talking about the fact that it

4       doesn't get diverted until after it's already been

5       received by the controlling entity.  And then after it's

6       received by the controlling entity, not only is it

7       diverted within it, but then it also determines whether

8       that message actually gets out to the outside network or

9       not, which they're referring to as the controlling

10      entity -- the controlling aspect of it.

11             Here's another example as to how there can

12      be no confusion whether we're talking about diverting or

13      controlling.  Again, Your Honor, this is what -- this is

14      the slide we went over earlier.  We're talking about the

15      context of 24B, which is clearly the diverting unit

16      claim limitation.

17             "Is it your opinion that step 24B occurs

18      after the message that's received by the interception

19      module??

20             "Yes.  The interception module has to make

41

1 decisions on and manipulate the message or the system

2 call, so, of necessity, the information would have to be

3 available to the interception module for it to do its

4 task."

5   So clearly we think this is a clear

6 disclaimer that they're arguing that the alleged

7 diverting unit doesn't do any type of diverting until

8 after the message has already been received by the

9 alleged controlling entity.

10   Do you have any other questions regarding

11 the Calder or Richardson combination?

12   JUDGE WEINSCHENK:  Nothing from me.

13   JUDGE ANDERSON:  I guess Calder and

14 Richardson is -- is an obvious -- does the expert --

15 does the -- does the Williams' expert talk about -- does

16 he talk about the motivation to combine the two?  And is

17 there some evidence of record that says you wouldn't --

18 that supports your position that it's the control --

19 that the controlling occurs before the -- the diverting,

20 and, therefore, that step is not met under the obvious

1    combination of Richardson -- or Calder and Richardson?

2          MR. MURPHY:  Yeah, Calder and Richardson.

3    The best way to address that would be the Board, in the

4    decision to institute, already found that Richardson

5    does not disclose the diverting step or a diverting

6    unit.  And further to that, if you look at the expert's

7    claim charts, he does not cite to the diverting unit.

8    He does not cite to any passages from Richardson.

9          JUDGE ANDERSON:  So is part of your -- I'm

10    sorry.  Is part of your position that the expert's --

11    that their expert supports your view of what Richardson

12    combined with Calder -- Calder -- Calder combined with

13    Richardson, excuse me, does not show this particular

14    order of steps?

15          MR. MURPHY:  Well, it seems like we're in

16    agreement about the order of the steps at this point.

17          JUDGE ANDERSON:  Yeah.  But beyond that, is

18    it supported -- is the combination -- is there evidence

19    that you can point to that that combination will not be

20    obvious to the person of ordinary skill, other than

1   attorney argument?

2       JUDGE BISK:  I think that the -- I think

3   the question is even if assuming we agree that Calder

4   shows no separate entity for diverting, and assuming

5   that we agree that that expert says that diverting comes

6   after, would it have been obvious to a person of

7   ordinary skill to flip it and do the diverting first and

8   even -- just because it really only makes sense, and

9   wouldn't be obvious to a separate, you know, program

10   entity?

11       MR. MURPHY:  No, Your Honor, I don't think

12   it would be obvious.  That's why these references are

13   lacking that disclosure.  There is no -- there's no

14   intermediary intervening box, will you, that does a

15   diverting step.  It simply analyzes the message as to

16   determine if it should be sent to a controlling entity.

17       JUDGE BISK:  But -- so what -- what you're

18   saying right now is different.  Where does it say that

19   the -- the diverting unit has to analyze and decide

20   whether it gets sent to the controlling entity?  You

44

1    have to agree that the diverting unit has to be

2    separate.  I don't see where the diverting unit has to

3    make any decision.  It just has to divert.

4          MR. MURPHY:  Right.  It has to divert a

5    message of the messages.

6          JUDGE BISK:  Right.  So where is any

7    analyzing going on there?

8          MR. MURPHY:  Well, in order to divert,

9    there has to be some type of built-in logic for it to

10   change the course -- be capable of changing the course

11   of a message.

12         JUDGE BISK:  Okay.  But that, to me, is

13   different than analyzing whether or not it's sent to the

14   controlling unit.

15         MR. MURPHY:  Okay.  I mean, maybe I

16   overstepped my bounds in what the claim requires, and I

17   apologize for that.

18         JUDGE BISK:  But I -- but I think is

19   similar to Judge Weinschenk's question, and I'm -- we

20   want to make sure we're all on the same page.  Does --

45

1    does the diversion -- is it okay for the diverting unit

2    to just pass everything along, in your view?  Or does

3    the diverting unit have to do something more?  We want

4    to make sure that we're understanding your position.

5             MR. MURPHY:  I think it has to be capable

6    of diverting a message.

7             JUDGE BISK:  And by that --

8             MR. MURPHY:  It has to be capable --

9             JUDGE BISK:  -- just passing it along?

10            MR. MURPHY:  It has to be capable of

11   changing the course of a message --

12            JUDGE BISK:  Okay.

13            MR. MURPHY:  -- after the message has been

14   sent from the application program --

15            JUDGE BISK:  Okay.

16            MR. MURPHY:  -- and before it's received by

17   the controlling entity.

18            JUDGE BISK:  But it does not have to be

19   capable of, based on some other decision-making process,

20   deciding what messages go here and what goes there?

1     That -- that -- it could do that, but it's not

2     necessary?

3            MR. MURPHY:  I would agree with that.

4            JUDGE BISK:  Okay.

5            MR. MURPHY:  I mean, as long as it's

6     capable of changing the course of a message.  After the

7     message has been sent from the application program and

8     before it's received by a controlling entity, as long as

9     it's capable of the deciding whether or not it should

10    divert the message or not.

11           JUDGE BISK:  Okay.

12           MR. MURPHY:  Judge Anderson, I don't know

13    if I answered your question earlier, but, I guess, my

14    argument with that would be -- it would not be obvious

15    because neither Calder or Richardson disclosed anything

16    close to the diverting step message as what's required

17    by the claims.  So therefore they wouldn't be obvious to

18    combine because neither one shows that element.

19           JUDGE ANDERSON:  Yeah, that was -- that was

20    my question, which Judge Bisk asked better than I did,

47

1    but I want to know what that --

2              MR. MURPHY:  I understood the question.

3              JUDGE ANDERSON:  -- the evidence that you're

4    relying on or that's not shown.  And I just heard your

5    answer, so that's fine.

6              MR. MURPHY:  Your Honor, so I'm going to

7    spend the last few minutes answering -- talking about

8    your favorite topic again, the RPI issue.

9              I'm going to go a little slower through

10   this HTC America presentation.  Here NEC Corporation has

11   the same issues.  And I think our position is clear --

12   just from the joint motion to terminate on its face,

13   it's clear that NEC Corp handles the removal of the

14   petitioners from this IPR proceeding.  I think the

15   highlighted portions in the joint motion to terminate is

16   clear on that.

17             CCE and NEC Corporation have also agreed to

18   jointly request the termination of this proceeding.

19   This is not talking about others and is licensed to us

20   and you guys are -- petitioners are subsidiaries so

1   therefore, you know, you get the benefit of whatever

2   license we may have gotten.  This is clearly saying CCE

3   and NEC request termination of this proceeding, which is

4   actual control over the proceeding by NEC Corp, who was

5   never identified as a real party in interest.

6          Slide 11 makes it clear again the

7   "settlement agreement's made in contemplation of

8   termination of the proceeding."  Of this proceeding; not

9   of the underlying litigation.  But the settlement

10  agreement was made in contemplation of a termination of

11  this proceeding.

12         Let's just talk a little about HTC America.

13  Here it's unclear whether -- as you saw, like, in the

14  petitioner's cover page, HTC America is identified as an

15  RPI in this proceeding.  Generally, conference calls

16  with the Board Petitioner asked the Board if they could

17  amend the petition to remove them as an RPI because that

18  was a scrivener's error.  So in this case, you have an

19  instance where due to scrivener's error of them

20  accidentally be included as an RPI, they asked the Board

1    if they could removed them as an RPI.  All the RPIs ever

2    filed by HTC Corp were always joined by HTC America.  So

3    HTC America seriously thought it was an RPI in every

4    other proceeding they've ever done before these ones.

5            You'll see another flavor of the other line

6    related IPR proceeding where on slide 15 their senior

7    director -- HTC America's senior director of patent

8    litigation was a signatory for filing a power of

9    attorney for HTC Corp.  So the three remaining IPR

10   proceedings are still alive.

11           JUDGE WEINSCHENK:  Is there anything wrong

12   with identifying someone as an RP -- RPI when they're

13   not actually one?  So if they accidentally

14   overidentified, is that -- is that a -- is that a

15   problem?

16           MR. MURPHY:  I don't think that in itself

17   is a problem.  I think the problem is if you look at the

18   circumstantial evidence and totality of the

19   circumstances, it doesn't all add up.  Did they

20   really -- did they really commit a scrivener's error by

1   including an RPI in two of the six IPRs?

2          JUDGE WEINSCHENK:  I guess I'm asking is

3   your argument regarding HTC America really limited to

4   the 1134 case and not this case?

5          MR. MURPHY:  I think as a whole -- you have

6   to look at all these cases as a whole for all the RPI

7   issues the same.  Like is -- was it a scrivener's error?

8   Should they be an RPI?  Do they need to be removed as an

9   RPI since it was a scrivener's error?

10         JUDGE BISK:  So HTC America was -- was

11   identified in this case?

12         MR. MURPHY:  They were identified in this

13   case, Your Honor.

14         JUDGE BISK:  All right.

15         MR. MURPHY:  But during conference calls

16   with the Board, they said that was due to scrivener's

17   error, and they asked the Board if they could remove

18   themselves as an RPI --

19         JUDGE BISK:  But --

20         MR. MURPHY:  -- and file a corrected

1    petition --

2            JUDGE BISK:  So what's the problem in this

3    particular case with the --

4            MR. MURPHY:  In this particular case,

5    they're saying that they should not be a -- should not

6    have been identified as an RPI.

7            JUDGE BISK:  That's the problem?  So

8    what -- what -- so they overidentified --

9            MR. MURPHY:  Well, no.  They're saying they

10   never should have been identified in the first place.

11   They said them identifying them as a -- HTC America as

12   an RPI was a scrivener's error.  It never should have

13   occurred.

14           JUDGE BISK:  And so --

15           MR. MURPHY:  So, therefore, they're

16   basically saying -- they're taking the approach that HTC

17   America shouldn't even be in this case.

18           JUDGE BISK:  Okay.  And what's the problem

19   with that?  To me, it seems like this is --

20           MR. MURPHY:  Is HTC America named as an RPI

52

1    or is it -- it is not?  They asked the Board if they

2    could remove them due to scrivener's error, the fact

3    that they were an RPI.

4        JUDGE BISK:  Right.  So -- but -- but Judge

5    Weinschenk asked what if they -- what if you over -- you

6    overput --

7        MR. MURPHY:  No, we don't have an issue

8    with that, but the fact is they requested HTC America to

9    be removed from an RPI.  So we're covering our basis to

10   the extent that they file a motion for correction of a

11   petition due to scrivener's error, and all of a sudden

12   HTC America was not identified as an RPI in this

13   proceeding.

14       JUDGE BISK:  Oh, so the only problem is

15   they take HTC America off?

16       MR. MURPHY:  They've already asked to take

17   HTC America off.

18       JUDGE BISK:  Okay.  But -- but the only

19   problem if they do that -- if they don't take them off,

20   in this case there's not a problem?  Only in the 1135 is

1    there a problem?

2         MR. MURPHY:  NO1135, whichever --

3         JUDGE BISK:  Right.

4         MR. MURPHY:  That's right, Your Honor.

5         JUDGE BISK:  Yeah.

6         MR. MURPHY:  With respect to the HTC

7    America argument.

8         JUDGE BISK:  Okay.

9         MR. MURPHY:  And the NEC Corporation

10   argument --

11        JUDGE BISK:  I just want to make sure I --

12        MR. MURPHY:  Okay.  We're on the same page.

13        JUDGE BISK:  Okay.  Very good.  Thank you.

14        I think we're actually over your time.  Did

15   you have anything else you wanted to add?

16        MR. MURPHY:  No, Your Honor.  That's it.

17   Thank you.

18        JUDGE BISK:  Okay.  And you have ten

19   minutes left on your time.

20        MR. MAAS:  Yes.  Thank you, Your Honor.

54

1          JUDGE BISK:  Go ahead.

2          MR. MAAS:  I would like to address

3    Mr. Williams' testimony -- deposition testimony --

4          JUDGE BISK:  Okay.

5          MR. MAAS:  -- that opposing counsel raised.

6          This is their slide -- this is patent

7    owner's slide 32.  The vast majority of these slides are

8    fully consistent.  There's no -- no confusion other than

9    the confusion that patent owner is trying to -- trying

10   to generate.

11         In order -- in the petition in his

12   declaration, Dr. Williams testified that, for D'Aviera,

13   the isolator engine performs a diverting step.  They --

14   they said -- opposing counsel even said that we just --

15   that he just cited to us because of -- of disclosure

16   from D'Aviera and that leaving it to -- I guess, to the

17   Board and to them to figure out exactly what he was

18   pointing to.

19         As I pointed out in direct, my -- my

20   opening, he actually underlined what he was calling --

1    what he was calling interceptor module when it

2    intercepts a message, so it was clear that the Board

3    understood what the institution said, and it clear the

4    patent owner understood it too.

5            The confusion in this snippet of -- of

6    testimony is not Dr. Williams.  It's -- it's patent

7    owner's.  Dr. Williams, the isolator engine does the

8    diverting -- it does the diverting, it does the

9    controlling.  The question doesn't break it down.

10           It just says, "So the -- the diverting

11   occurs after the messages are received by the isolator

12   engine?"

13           And he said "Yes," basically.

14           JUDGE BISK:  Well, what about the

15   questions, though, where they specifically identify the

16   limitation by number?  I think it's 24B.

17           MR. MAAS:  I'll jump to that.

18           JUDGE BISK:  Okay.  Thank you.

19           MR. MAAS:  And just to wrap this up, but I

20   won't go through -- but the next few slides, if you look

1    at it in terms of the isolator -- the isolator engine

2    doing both -- both functions, it's -- it's clear that --

3    that the isolator -- the isolator engine has to -- in

4    order to divert, it has to actually receive the message.

5    It can't divert something it doesn't receive.

6            I'll jump to -- I'm jumping to slide 46.

7    This is the patent owner's slides.  So this -- this

8    is -- so this --

9            "Is it your opinion that step 24B," which

10   is the diverting step," occurs after the message that's

11   received by the interception module?"

12           And he says, "Yes."

13           And this is in reference to Calder.  But

14   for the interception module to do the diverting step to

15   actually divert a message, it actually has to receive

16   it.  So analogous to a football player in a football

17   game, when somebody throws a pass and the -- the player

18   for the other time receives it -- intercepts it, he has

19   to receive it.  He still has a decision he has to make

20   whether to take it downfield or maybe kneel if it's

57

1        towards the end of the game.  That's more --

2               JUDGE BISK:  So that -- actually, that

3        confuses me a little because when I think of diverting

4        as -- what I thought you were saying is that means that

5        by the -- is that the diverting is, basically, at the

6        same time it's -- it is the receiving of it because the

7        message is not going to a number, but it is instead

8        going to the interceptor module.  That is the diversion

9        itself.  So there is no -- so -- so it does -- it is

10       nonsensical to say that it -- the diverting happens

11       after it receives it.  The diverting is the fact that

12       it's receiving --

13              MR. MAAS:  It -- exactly.  It is the

14       reception.

15              JUDGE BISK:  So this answer -- I mean,

16       the -- the -- the explanation afterwards I can see may

17       be a little confused because the interception module is,

18       in his mind, acting as both things.  So since the

19       diverting is the receiving, then there's a -- you know,

20       a part of the controlling entity could be another

1    diverting, so that happens after.

2          But 24B is a little specific.  It's asking

3    this diverting step occurs after the message is

4    received, and he says, "Yes."  To me, that's -- that's a

5    little -- I can see why the patent owner would point

6    that out as being not in line with what you're saying.

7          MR. MAAS:  Yeah, it is a little

8    confusing --

9          JUDGE BISK:  Yeah.

10          MR. MAAS:  -- because we're dealing with a

11    box.  And I agree with you that diversion occurs when

12    that message -- at that point when that message reaches

13    that box.

14          JUDGE BISK:  Uh-huh.

15          MR. MAAS:  What causes it to divert?  It's

16    a program within that box.  So it -- it's confusing when

17    we get to the temporal about when and after and at that

18    moment.  It's very difficult to --

19          JUDGE BISK:  And I don't think -- does your

20    theory -- it doesn't -- or your -- it -- your petition

59

1    doesn't rely on the fact that in order to divert you

2    have to receive, does it?  I would say that that's not

3    what diverting means.

4              In the football metaphor, if I just -- if

5    I -- if I stand between the two guys, the one running

6    the ball and the one catching it -- I don't know the --

7    tackle -- football terms.  Sorry.  And -- and you -- and

8    I just put my hand up and, you know, bat it away, I

9    didn't receive the football, but I diverted it from --

10   from where it was going.  So I -- I think that my – in

11   my mind, a construction of diverting does not require

12   receiving.

13             MR. MAAS:  No.  The construction of

14   diverting just requires change in course.

15             JUDGE BISK:  Okay.

16             MR. MURPHY:  And that's --

17             JUDGE BISK:  In -- in D'Aviera they happen

18   to be the same thing, but --

19             MR. MAAS:  Yes.

20             JUDGE BISK:  Under your --

1          MR. MAAS:  Yeah.  We -- we weren't

2     challenging the construction.

3          JUDGE BISK:  Okay.

4          MR. MAAS:  Challenging the construction is

5     change of course so -- and in D'Aviera, both -- in

6     D'Aviera, the messages are going out to the network.

7     They get diverted to the -- by the -- by the isolator

8     engine to the isolator engine, which then can be the

9     controlling step.

10         JUDGE BISK:  Okay.

11         MR. MAAS:  Okay.  And that's -- and the

12    controlling step, as I've mentioned, could include

13    further diversion where the message -- where it decides

14    not to let the message go out.

15         JUDGE BISK:  And so -- so I guess my

16    ultimate question is, what do we do with the answer

17    "Yes" here?

18         MR. MAAS:  The -- the answer with "Yes"

19    is -- looking at the weight of his other testimony in

20    his declaration, the other excerpts of the deposition in

1    which the patent owner has called out, which are fully

2    consistent with his declaration given the confusion that

3    we're dealing with a box, we're -- it -- it seems like

4    we're putting a lot of weight on the word "after."

5          So -- so the -- because the vast majority

6    of the call (unintelligible) providing the slides are

7    fully consistent with his declarations, so it's -- it's

8    one or two that there's some confusion.

9          JUDGE WEINSCHENK:  Does Petitioner agree

10   with the construction of divert that was in our decision

11   institution?

12         MR. MAAS:  Yes, Petitioners -- for purposes

13   of the IPR.

14         JUDGE BISK:  I think that we're actually

15   over time now, so if you have one more short statement

16   you want to make.

17         MR. MAAS:  I would as soon ask Steve Moore,

18   who represents HTC, to address the RPI issue with

19   respect to HTC.  With respect to NEC, we'd just like to

20   incorporate our prior --

1          JUDGE BISK:  I think HTC, though, I think

2     that -- well, come on up and -- and address it.

3          MR. MAAS:  With respect to NEC, the RPI

4     issue we'd like to just incorporate, if we may, the --

5     from the -- the petitioner's arguments in IPR1134.

6          JUDGE BISK:  Okay.  We can.

7          MR. MOORE:  Yes, Your Honor.  Steve Moore

8     for HTC.  The only thing that I might add to your

9     analysis earlier is that we would incorporate the -- the

10    information provided in the previous case and that

11    analysis on where is the relevant information --

12    where's the relevant facts in this case.

13         JUDGE BISK:  But it seems to me there isn't

14    an issue in this case.

15         MR. MOORE:  Secondarily.  We completely

16    agree.

17         JUDGE BISK:  Okay.

18         MR. MOORE:  There is no issue in this case.

19    Regardless of whether or not they were or were not

20    supposed to be named, our position is they were not.

1    Hearing that they were overincluded, there -- there

2    isn't an issue that would require the Board to

3    adjudicate.

4              JUDGE BISK:  All right.  Thank you.

5                                We're adjourned.

STATE OF TEXAS

(COUNTY OF TARRANT)


This is to certify that I, HOPE LEWANDOSKI, a

Certified Shorthand Reporter, reported in shorthand

the proceedings at the Dallas Bar Association on August

26, 2015, at 5:33 p.m., and that the foregoing 51 pages

contain a true and correct verbatim transcript to the

best of my ability of said proceedings.

Given under my hand and seal of office on this

the 9th day of September, 2015.




_____

HOPE LEWANDOSKI, Texas CSR 6255

Expiration Date: 12-31-15

DEPOTEXAS

Firm Registration No. 459

6500 Greenville Avenue, Suite 445

Dallas, Texas  75206

(214) 373-4977a