# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC, <br><br> Plaintiff <br><br> v. <br><br> HTC CORPORATION, ET AL., <br><br> Defendants. | Civil Action No. 6:16-cv-363-KNM <br><br> **CONSOLIDATED LEAD CASE** <br><br> JURY TRIAL DEMANDED |
| CELLULAR COMMUNICATIONS EQUIPMENT LLC, <br><br> Plaintiff, <br><br> v. <br><br> ZTE CORPORATION, ET AL., <br><br> Defendants. | Civil Action No. 6:16-cv-375-KNM <br><br> JURY TRIAL DEMANDED |

**DEFENDANTS' JOINT RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

                                                                                                                   **Page**

I. INTRODUCTION ............................................................................................................ 1
II. BACKGROUND .............................................................................................................. 2
    A. The '8,923 Patent ..................................................................................................... 2
    B. Procedural History ................................................................................................... 5
III. LEGAL STANDARDS .................................................................................................... 6
IV. DISPUTED TERMS AND PHRASES ............................................................................. 7
    A. "diverting unit" (claim 24) ....................................................................................... 7
    B. "controlling entity" (claims 24, 26) ....................................................................... 13
V. CONCLUSION ............................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
 314 F.3d 1313 (Fed. Cir. 2003)..................................................................................................13

*Apple Inc. v. Motorola, Inc.*,
 757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson v.
 Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ................................................................11

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
 749 F.3d 1349 (Fed. Cir. 2014)...................................................................................................6

*Ekchian v. Home Depot, Inc.*,
 104 F.3d 1299 (Fed. Cir. 1997).................................................................................................12

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016)...........................................................................................10, 15

*Final Written Decision*,
 2016 WL 67220 ......................................................................................................................1, 15

*Final Written Determination*,
 2016 WL 67220 ........................................................................................................................5, 10

*Grober v. Mako Prod., Inc.*,
 686 F.3d 1335 (Fed. Cir. 2012).................................................................................................12

*HTC Corp. v. Cellular Commun'ns Equip., LLC*,
 IPR2014–01133, 2016 WL 67220 (P.T.A.B. Jan. 4, 2016)..................................................1, 12

*HTC Corp. v. Cellular Commun's Equip., LLC*,
 701 Fed. Appx. 978 (Fed. Cir. 2017)................................................................................. passim

*iFLY Holdings LLC v. Indoor Skydiving Germany GmbH*,
 No. 2:14-CV-1080-JRG-RSP, 2015 WL 9258264 (E.D. Tex. Dec. 17, 2015).......................12

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*,
 285 F.3d 1046 (Fed. Cir. 2002)...................................................................................................7

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005)...................................................................................................7

I.      INTRODUCTION

Defendants HTC Corporation, HTC America, Inc., ZTE Corporation, ZTE Solutions, Inc., and ZTE (USA), Inc. (collectively, "Defendants") hereby submit their Responsive Claim Construction Brief regarding certain terms in U.S. Patent No. 7,218,923 (the "'8,923 Patent").

The only terms that require construction are "diverting unit" and "controlling entity." These terms have been construed by both the Patent Trial and Appeals Board ("PTAB") and the Federal Circuit to require "separate components" for performing their recited functions.  *See HTC Corp. v. Cellular Commun's Equip., LLC*, 701 Fed. Appx. 978 (Fed. Cir. 2017) ("*HTC*"); *HTC Corp. v. Cellular Commun'ns Equip., LLC*, IPR2014–01133, 2016 WL 67220 (P.T.A.B. Jan. 4, 2016) ("*Final Written Decision*").[1]

The parties dispute what is meant by "separate components."  Because "component" lacks any inherent meaning in this context and is neither mentioned nor explained in the '8,923 Patent, a proper construction of the "diverting unit" and "controlling entity" must capture the Federal Circuit's requirement that each software element be separate and distinct from the other. Defendants' constructions reflect that requirement by defining each term to be "a component with a separate structure than that of the [other]." CCE contends that "structure" implies a *physical* structure, but it does not. The Federal Circuit used that same language throughout its analysis, including its conclusion that "the only reasonable construction of the claim language, in light of the specification, is that claim 24 assumes separate ***structures*** for the 'diverting unit' and the 'controlling entity.'" HTC, 701 Fed. Appx at 983.[2] Accordingly, Defendants' construction is consistent with and supported by the Federal Circuit's holding.

---

[1] Although the Board stated that "no claim terms require express construction," *Final Written Decision*, 2016 WL 67220, at *3, the Federal Circuit held that the Board did indeed construe the 'diverting' and 'controlling' limitations.  *HTC*, 701 Fed. Appx. at 981.

[2] All emphasis in the brief is added unless otherwise noted.

1

## II. BACKGROUND

### A. The '8,923 Patent

There is no dispute that the '8,923 Patent is a software patent. It claims a system and method for reducing the security risk posed to mobile devices (e.g., smartphones) by third-party applications installed on those devices. Mobile devices provide an "open development platform" on which developers can design and deploy new applications. '8,923 Patent at 1:31-37. Mobile device users wishing to enhance the functionality of their devices may download and install such third-party applications. *Id.* Downloading and installing third-party applications may pose a security risk if those applications have been designed to behave maliciously or otherwise inappropriately. '8,923 Patent at 1:38-47.

The '8,923 Patent seeks to reduce the security risk associated with third-party applications by equipping a mobile device with software that monitors the network communications of third-party applications. '8,923 Patent at 1:48-2:11. When a third-party application attempts to transmit a message onto the wireless network, the new software "diverts" the message to a software "controlling entity" for evaluation. *Id.* The controlling entity software evaluates the message to determine whether the third-party application is behaving properly. *Id.* If it detects no problem, the controlling entity software returns the message for transmission over the network. *Id.* If the controlling entity software detects a problem, however, it may return a modified message for transmission, or it may block the transmission altogether. *Id.*

To avoid unwanted tampering, software implementing the controlling functionality must execute in a tamper-resistant area of the device, independently of the third-party applications. '8,923 Patent at 2:3-10. The '8,923 Patent describes examples of software structures that can perform the diverting functionality, such as a "middleware modification module" or "changes made within the [network communications] stack." '8,923 Patent at 6:49-55. Likewise, the

patent provides examples of software structures for performing the controlling functionality, such as a "dedicated software agent" or as a "Digital Rights Management (DRM) agent whose normal functionality has been modified for the method of the invention." '8,923 Patent at 3:63-66.

Figure 2 illustrates a representative embodiment of the Claimed invention:



FIG. 2

'8,923 Patent at Fig. 2.

Figure 2 illustrates a mobile device that includes a tamper-resistant area 200 and an open platform area 201. '8,923 Patent at 3:57-4:19. The open platform area hosts a number of applications 210, which may include third-party applications. *Id.* To communicate over the network 10, applications 210 pass messages to SIP protocol stack 220. *Id.* The SIP protocol stack 220 is network communications software that implements the Session Initiation Protocol. *Id.*

According to the embodiment of Figure 2, SIP protocol stack 220 has been modified to incorporate software that monitors the messages received from the applications 210. '8,923

3

Patent at 4:46-5:8; 6:49-50. When SIP protocol stack 220 receives a message generated by an application 210, the software checks a database (application repository 211) to determine whether the application 210 is subject to controls. *Id.* If so, the software forwards the application's message to trusted agent 212, which is software executing in tamper-resistant area 200. *Id.* Again, the trusted agent 212 software may be implemented as a dedicated agent or simply as functionality built into another component, such as a Digital Rights Management (DRM) agent. '8,923 Patent at 3:63-66.

The trusted agent software 212 examines the message to determine whether the application is behaving correctly. '8,923 Patent at 4:61-63. If not, the trusted agent software may block the message or modify and return it to the SIP protocol stack 220 for transmittal in the modified form. '8,923 Patent at 4:61-5:4. If the trusted agent software detects no problem, it may return the message to the SIP protocol stack 220 unmodified. Once returned to the SIP protocol stack 220, the message is sent over the network. *Id.*

Claim 24 is the only independent Claims at issue. Claim 24 is a system Claim covering a terminal comprising an application program, a diverting "unit," and a controlling "entity":

> 24. A terminal for a communication system, the terminal comprising:
>
> an application program configured to send messages towards a communication network; and
>
> a diverting unit configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal,
>
> wherein the controlling entity is configured to control, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal, and
>
> wherein the terminal is a terminal of a communications system.

'8,923 Patent, cl. 24. Claim 24 is silent regarding how or by what structure the diverting and controlling are performed. The Claim recites only that a "unit" performs the diverting and that an "entity" performs the controlling. The Claims do not define "unit" and "entity" other than by their functions.

### B. Procedural History

Defendants HTC Corporation, HTC America, and ZTE (USA), Inc. petitioned the PTAB to institute *inter partes* review of the '8,923 Patent. The PTAB instituted an IPR and issued a final written decision that the challenged claims were not shown to be unpatentable. *Final Written Determination*, 2016 WL 67220. In the IPR, CCE argued "that the diverting unit and controlling entity in claim 24 are separate components" and further contended that Defendants did "not show that D'Aviera discloses a separate component for the diverting limitation in the challenged claims." *Id.* at *4.

In its final written decision, the PTAB held that "[t]he claims of the '923 patent indicate that the diverting and controlling steps in claim 1 are performed by separate components, and that the diverting unit and controlling entity in claim 24 are separate components." *Id.* at *4. The PTAB applied its construction, <u>adopted at CCE's urging</u>, to find that the asserted prior art did not disclose a "diverting unit" and "controlling entity" as separate structures:

> ***Petitioner also argues that one part of the isolator engine in D'Aviera diverts a message and another part controls the message***. Pet. Reply 5, 7. According to Petitioner, to divert a message sent from an application program, the isolator engine is configured to listen to a particular port number used by the application program. Id. at 5; Ex. 1008, 5:3–14. To control an intercepted message, the isolator engine compares the intercepted message to a file containing a privacy list to determine whether the intercepted message contains any of the items in the privacy list. Pet. Reply 7; Ex. 1008, 3:26–29, 6:14–22. ***Petitioner's argument is not persuasive. Petitioner describes the different functions performed by the isolator engine, but does not show that the isolator engine is two separate components***

*Id.* at *5. Thus, the basis for overcoming the asserted prior art was a structural separation.

5

The Federal Circuit reviewed the PTAB's construction de novo and affirmed that Claim 24 "requires separate components for diverting and for controlling." *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 Fed. Appx. 978, 982 (Fed. Cir. 2017). Ultimately, the Court concluded that "the only reasonable construction of the claim language, in light of the specification, is that claim 24 assumes ***separate structures*** for the 'diverting unit' and the 'controlling entity.'" *Id.* at 983. The Court's opinion recognizes that:

> [T]he specification consistently describes the "diverting" step as performed by either the "SIP protocol stack" or a "middleware modification module." *See* '923 patent, col. 4, lines 46–61; *id.*, col. 6, lines 20–26; *id.*, col. 6, lines 49–55 ("The functionality needed in the SIP protocol stack may be introduced as changes made within the protocol stack, as is assumed in the above examples. Alternatively, the functionality may be introduced as a separate middleware modification module that resides between the applications(s) and the protocol stack and which thus also provides an Application Program Interface (API) for the applications."). In contrast, the specification describes the "controlling" step as being performed by a "controlling entity," identified as the "trusted agent," *id.*, col. 2, lines 10–11, which "may be a dedicated software agent or a Digital Rights Management (DRM) agent whose normal functionality has been modified for the method of the invention," *id.*, col. 3, lines 63–66. The specification thus describes two possible structures for performing the "diverting" step, both of them distinct from the two possible structures for performing the "controlling" step.

*Id.* at 982. Thus, the Federal Circuit consistently and repeatedly referred to the "diverting unit" and "controlling entity" as "structures. *See id.* at 982 ("The strongest evidence for this separation is the claim language itself, which plainly recites two different structures: a 'diverting unit' and a 'controlling entity.' '923 patent, col. 10, lines 62–65.).

## III.   LEGAL STANDARDS

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1354-55 (Fed. Cir. 2014). "Consistent with its scope definition and notice functions, the claim requirement presupposes

6

that a patent applicant defines his invention in the claims, not in the specification. After all, the claims, not the specification, provide the measure of the patentee's right to exclude." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002). Claims are given their ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

## IV. DISPUTED TERMS AND PHRASES

### A. "diverting unit" (claim 24)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "<u>a component with a separate structure than that of the controlling entity</u>, which is configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal . . ." | Plain and ordinary meaning; no construction necessary.<br><br>Alternatively: "a component, separate from the controlling entity, that is configured to divert a message destined for the communications network" |

The intrinsic evidence demonstrates that a "diverting unit" refers to "a component with a separate structure than that of the controlling entity," and that it performs the diverting functions recited in the claim (i.e., it is "configured to divert a message of the messages sent from the application program and destined for the communication network to a controlling entity residing in the terminal," '8,923 at 10:62-65). The Federal Circuit reached that same conclusion in its own claim construction analysis. CCE wrongly contends that "structure" requires ***physical*** structure and proposes that either no construction is necessary or that requiring a separate "component" is sufficient. But there is no dispute that the "diverting unit" is software, not a physical structure, and the intrinsic evidence and the Federal Circuit's analysis confirm that the diverting unit must be structurally separate from the controlling entity.

The claim language requires both a "diverting unit" and a "controlling entity." As the Federal Circuit held, that distinction in language alone indicates that each is structurally separate from the other:

> The strongest evidence for this separation is the claim language itself, <u>which plainly recites two different **structures**</u>: a "diverting unit" and a "controlling entity." '923 patent, col. 10, lines 62-65. The separate naming of two structures in the claim strongly implies that <u>the named entities are not one and the same **structure**</u>.

*HTC*, 701 F. App'x at 982. Thus, the claim language supports construing "diverting unit" to be a component with a separate structure than that of the controlling entity.

The specification reinforces and supports that construction. It describes examples of software structures that can perform the diverting functionality, such as a "middleware modification module" or "changes made within the [network communications] stack." '8,923 Patent at 6:49-55. And it similarly describes example software structures for performing the controlling functionality, such as a "dedicated software agent" or as a "Digital Rights Management (DRM) agent whose normal functionality has been modified for the method of the invention." *Id.* at 3:63-66. That structural separation is important because to avoid unwanted tampering, the controlling functionality must be executed in a tamper-resistant area of the device, independently of the third-party applications. *Id.* at 2:3-10. The diverting functionality, meanwhile, can be executed outside of the tamper-resistant area of the device, as reflected in Figure 8's embodiment:



FIG. 8

As that figure illustrates, the diverting unit (SIP Protocol Stack 220, highlighted in yellow), is structurally separate from the controlling entity (trusted agent 212, highlighted in green).

The Federal Circuit relied on that structural separation in the specification as well. As it found, "the specification thus describes two possible **structures** for performing the 'diverting' step, both of them distinct from the two possible **structures** for performing the 'controlling' step." *HTC*, 701 Fed. App'x at 982. "Furthermore, the specification repeatedly describes the 'trusted entity' as residing in a 'tamper resistant area of the terminal.' . . . Every time the 'trusted entity' is shown in a figure, it is shown inside the 'tamper resistant area' and separate from the 'SIP protocol stack,' which is doing the diverting and resides in the 'open platform area.'" *Id*. The Federal Circuit noted that even where the specification contemplates placing both components in the same area, it "speaks of [the diverting unit] as a separate entity being wholly moved, not incorporated into the 'controlling entity.'" *Id*. The specification therefore also supports construing "diverting unit" to be a component with a separate structure than that of the controlling entity.

A definition that refers only to a "separate component," as CCE alternatively proposes, is not sufficient. Although both the PTAB and the Federal Circuit stated that a "diverting unit" is a

9

"separate component" from the "controlling entity," they failed to address what a "component" means in a software context or analyze whether that term has a standard meaning in the art. Without more, referring only to separate "components" might improperly capture separate <u>parts</u> of the same software structure, which the PTAB and the Federal Circuit have expressly rejected. *Final Written Determination*, 2016 WL 67220, at *5 ("Petitioner also argues that <u>one **part** of the isolator engine</u> in D'Aviera diverts a message and <u>another **part**</u> controls the message. . . . Petitioner's argument is not persuasive. Petitioner describes the different functions performed by the isolator engine, but does not show that the isolator engine is two separate components."); *HTC*, 710 Fed. App'x at 982-983.

Indeed, failing to provide context about the required separation risks rendering the claims ambiguous. The "diverting unit" and "controlling entity" are otherwise defined only by their respective functions, which in the context of software would necessarily be implemented as separate instructions. But the patent makes clear that a "diverting unit" cannot simply be separate instructions within, for example, the DRM agent performing the controlling entity functionality, but rather must be a separate structure entirely, such as the SIP stack. *See* '8,923 patent, col. 7, ll. 5-9; *see also HTC*, 710 Fed. App'x at 982 ("The specification contemplates that the SIP stack might sometimes be in the "tamper resistant area," but speaks of it as a separate entity being wholly moved, not incorporated into the "controlling entity."). Thus, the patent requires that each must be *structurally* separate from the other.

Contrary to CCE's contention, software can and does have "structure" that does not imply a *physical* structure. Indeed, advancement in computer technology is often defined by such non-physical structures. *See, e.g.*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) ("Much of the advancement made in computer technology consists of

improvements to software that, by their very nature, may not be defined by particular physical features *but rather by logical structures and processes*.") (emphasis added). As the Federal Circuit has explained:

> "Structure" to a person of ordinary skill in the art of computer-implemented inventions may differ from more traditional, mechanical structure. For example, looking for traditional "physical structure" in a computer software claim is fruitless because software does not contain physical structures. Indeed, the typical physical structure that implements software, a computer, cannot be relied upon to provide sufficiently definite structure for a software claim lacking "means." Rather, **to one of skill in the art, the "structure" of computer software is understood through, for example, an outline of an algorithm, a flowchart, or a specific set of instructions or rules**.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (emphasis added). Thus, requiring a separate structure in the context of software has meaning, whereas a separate "component" does not.

As a result, CCE's alternative definition fails to instruct the jury what would constitute a "separate component" and how it differs from separate software instructions for performing a given function. The word "component" does not appear even once in the specification. Nor does the specification describe any structural qualities of the "diverting unit," except to indicate they are performed by executing software instructions. *See* '8,923 Patent at 3:63-65; 6:49-55. Indeed, when read within the context of the specification and in light of CCE's arguments before the PTAB and Federal Circuit, it is clear the "diverting" must be performed by a distinct structure – i.e., a separate set of software instructions – separate from what performs the "controlling" function.

Indeed, CCE survived the IPR by advancing that narrower interpretation. Defendants' IPR petition argued that different instructions within one part of the prior art reference, *e.g.*, an "isolator engine in D'Aviera" and "interception module in Calder", would act as the diverting

11

unit to divert a message and another part as the controlling entity to control the message. *See HTC Corp.*, 2016 WL 67220, at *5-6. In response, CCE urged its "separate components" construction for the "diverting unit" and "controlling entity" limitations and asserted that under such a construction Defendants could not show that either the "isolator engine in D'Aviera" or "interception module in Calder" disclosed the "diverting unit" and "controlling entity" limitations. *Id.* The PTAB agreed with CCE's construction, and, on that basis, found Defendants had not shown the challenged claims were unpatentable. *Id.* at *5-6 ("[B]ecause Petitioner does not identify separate components in D'Aviera . . . for the diverting unit and controlling entity in claim 24, Petitioner has not shown by a preponderance of the evidence that D'Aviera anticipates. . . . Petitioner does not identify separate components in Calder and Richardson . . . for the diverting unit and controlling entity in claim 24 . . . Therefore, Petitioner has not shown by a preponderance of the evidence that [the] claims . . . would have been obvious over Calder and Richardson.). Thus, CCE's success in the IPR proceeding was premised on advancing a narrower interpretation.

CCE must be held to that disclaimer. "[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997)); *see also iFLY Holdings LLC v. Indoor Skydiving Germany GmbH*, No. 2:14-CV-1080-JRG-RSP, 2015 WL 9258264, at *11 (E.D. Tex. Dec. 17, 2015). Statements made by the patentee during post-grant proceedings at the Patent Office have equal weight in this analysis. *Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("Statements made during [*inter partes*] reexamination can also be considered in accordance with this doctrine.") (internal citations omitted). CCE cannot advance a restrictive interpretation to succeed over prior art in the

12

IPR and attempt to prove infringement by pressing for a more expansive one. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement.").

For these reasons, a "diverting unit" should be construed to be "a component with a separate structure than that of the controlling entity," which captures the PTAB and Federal Circuit's "separate components" construction and gives effect to CCE's unmistakable disclaimer.

### B. "controlling entity" (claims 24, 26)

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "<u>a component with a separate structure than that of the diverting unit</u>, which is configured to control, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal . . ." | Plain and ordinary meaning; no construction necessary.<br><br>Alternatively: "a component, separate from the diverting unit, that can control the rights and behavior of applications" |

Defendants' arguments with respect to the "diverting unit" apply with equal force to the parties' dispute over the "controlling entity" limitation. The intrinsic evidence demonstrates that a "controlling entity" refers to "a component with a separate structure than that of diverting unit," and that it performs the controlling functions recited in the claim (i.e., that it "is configured to control, based on the message and before the message is transmitted to the communication network, whether the application program behaves in a predetermined manner in the communication terminal . . ." '8,923 Patent at 10:66-11:3). In addition, Plaintiff's proposed alternative construction reads out substantive limits on the "controlling entity" limitation's recited functions, such as controlling "based on the message" and that the controlling is predicated on "whether the application program behaves in a predetermined manner." *See* '8,923 Patent at at 10:66-11:3. There is no basis in the intrinsic record for expanding the scope

13

of these claims, and indeed Plaintiff fails to provide any support for its broadened alternative construction.

For much the same reason that there is no "plain and ordinary meaning" for the "diverting unit" limitation, the "controlling entity" is defined in large part by its function and is not alleged to have a standard, accepted meaning to those skilled in the art. The claim language confirms the required separation between the "diverting unit" and the "controlling entity." *HTC*, 701 F. App'x at 982 ("The strongest evidence for this separation is the claim language itself."). Thus, the claim language supports construing "controlling entity" to be a component with a separate structure than that of the "diverting unit."

The specification likewise supports this construction. It describes the controlling functionality as a "dedicated software agent" or as a "Digital Rights Management (DRM) agent whose normal functionality has been modified for the method of the invention." '8,923 Patent at 3:63-66. It is represented in Figure 2 below as the "Trusted Agent 212":



'8,923 Patent at 3:63-66, Fig. 2. As that figure illustrates, the controlling entity (trusted agent 212, highlighted in green), is structurally separate from the diverting unit (SIP Protocol Stack 220, highlighted in yellow).

14

As with the "diverting unit," neither the PTAB nor the Federal Circuit elaborated on the particular structural characteristics needed to satisfy the "controlling entity" limitation or how a "separate components" construction could be applied in practice.  As mentioned above, software limitations lack traditional physical structure, and instead are represented by "logical structures and processes."  *See Enfish*, 822 F.3d at1339.  But CCE's argument to avoid invalidation over the prior art provides a clear window into the scope of this claim element, and it must be held to that disclaimer.  *See Final Written Decision*, 2016 WL 67220, at *5-6 (successfully distinguishing prior art on the basis that neither the "isolator engine in D'Aviera" or "interception module in Calder" disclosed "separate components" for the "diverting unit" and "controlling entity" limitations).  It is thus likewise clear that the "controlling" must be performed by a distinct structure – i.e., a separate set of software instructions – separate from what performs the "diverting" function.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that their proposed constructions for the "diverting unit" and "controlling entity" limitations be adopted in their entirety.

| Dated:  March 2, 2018 | Respectfully submitted, |
|---|---|
|  | */s/   Nicole S. Cunningham*<br>Callie A. Bjurstrom (CA SBN 137816)<br>callie.bjurstrom@pillsburylaw.com<br>Steven A. Moore (CA SBN 232114)<br>steve.moore@pillsburylaw.com<br>Nicole S. Cunningham (CA SBN 234390)<br>nicole.cunningham@pillsburylaw.com<br>Matthew R. Stephens (CA SBN 288223)<br>matthew.stephens@pillsburylaw.com<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>501 West Broadway, Suite 1100<br>San Diego, CA 92101<br>Phone: 619.544.3119 |

| | |
|---|---|
| | Fax: 619-236-1995 |
| | *Attorneys for HTC Corporation, HTC America, Inc., ZTE Corporation, ZTE (USA), Inc., and ZTE Solutions, Inc.* |

## **CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served on March 2, 2018 with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A).

/s/ Nicole S. Cunningham
Nicole S. Cunningham
