# EXHIBIT A

CASE IPR2014-01133  
U.S. Pat. No. 7,218,923

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

NEC CORPORATION OF AMERICA, NEC CASIO MOBILE COMMUNICATIONS, LTD., HTC CORPORATION, HTC AMERICA, ZTE (USA), PANTECH CO., LTD., PANTECH WIRELESS, INC., LG ELECTRONICS, INC., and LG ELECTRONICS U.S.A., INC.,

Petitioners

v.

CELLULAR COMMUNICATIONS EQUIPMENT LLC,

Patent Owner

_____

Case IPR2014-01133  
Patent Number: 7,218,923

_____

**CELLULAR COMMUNICATIONS EQUIPMENT LLC**

**<u>PATENT OWNER'S RESPONSE</u>**

i

However, as described in more detail below, the references cited in Grounds A and B fail to disclose an intervening step of "divert[ing]" a message to the claimed controlling entity where the "diver[ting]" of the message occurs after the message has been sent from the claimed application program and before the message is received and controlled by the claimed controlling entity.

## VII. D'AVIERA DOES NOT ANTICIPATE THE CHALLENGED CLAIMS

### A. D'Aviera Fails to Disclose the "Divert[ing]" Step as Required by Independent Claims 1 and 24.

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity. Close scrutiny of D'Aviera, on the other hand, reveals that there is no disclosure of an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after the message has been sent from an application program and before the message is received by the claimed controlling entity.

The Petition and Declaration fail to even identify the structure or process capable of performing this intervening step of "divert[ing]" a message to the claimed controlling entity. This deficiency in D'Aviera is highlighted by the

30

Petitioner having to rely on inherency as to where the claimed "diverting unit" is disclosed in D'Aviera. *See* Petition at 51; Declaration at Appendix B-1, 24-25. Rather, Petitioner attempts to circumvent this deficiency by pointing to the word "intercepts" to make conclusory arguments that the "divert[ing]" step is disclosed in D'Aviera. But these arguments fail because D'Aviera does not disclose, teach, or suggest the claimed intervening step of "divert[ing]" a message sent from the application program to the claimed controlling entity, as required by independent claims 1 and 24.

D'Aviera is directed to a system and method for controlling transmission of information using an isolator engine 225 that receives outbound operations of an application program 210 that is attempting to send messages to the Internet via a network module 220. *See* D'Aviera at Abstract; FIG. 2. D'Aviera's isolator engine 225 is a standalone application, the execution of which can be initiated by double clicking on an icon. *Id.* at 4:3-5.

The isolator engine 225 only analyzes messages from an application program 210 when the isolator engine 225 has been turned on by the user. *Id*. at 4:24-29; 5:3-12; FIG. 2. When the isolator engine is turned off, the messages from the application program pass through the isolator engine because the isolator engine is not listening for messages sent over the port number used by the application program. *Id*. Upon execution of the isolator engine 225, the isolator

31

engine 225 listens for messages sent over the same port number as used by the application program. *Id*. Thus, the isolator engine 225 receives all of the messages sent from the isolator engine 225, but the isolator engine 225 only analyzes the message when it is listening for messages sent over the same port number as used by the application program 210. *Id*.

To the extent that the isolator engine 225 could correspond to the claimed controlling entity, which Patent Owner disagrees, Petitioner has not shown where D'Aviera discloses the claimed intervening step of "**diverting** a message of the messages [sent towards a communication network] **to a controlling entity**," as recited in claim 1, or "**a diverting unit** configured to **divert a message of the messages** sent from the application program and destined for the communication network **to a controlling entity**," as recited in claim 24 (emphasis added).

As shown in FIG. 2 of D'Aviera, reproduced below, D'Aviera does not disclose anything between the application program 210 and the isolation engine 225 (i.e., the alleged controlling entity) that could perform the intervening "divert[ing]" step, as required by claims 1 and 24.

32

CASE IPR2014-01133
U.S. Pat. No. 7,218,923



FIG. 2

As discussed above, to meet the claimed "divert[ing]" step, there must be something that "diverts" a message of messages after the message is sent from the application program and before the message is received by the controlling entity. For at least these reasons, D'Aviera cannot teach or suggest the claimed "divert[ing]" step. Further, by pointing to the isolator engine 225 for both the diverting and control functions, the Petitioner vitiates the "divert[ing]" limitation.

**B.     Testimony of Petitioner's Technical Expert Confirms that D'Aviera Fails to Disclose the Diverting Step as Required by Independent Claims 1 and 24**

As described above, the plain language of independent claims 1 and 24

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity where the "divert[ing]" step is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity. The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below confirms that Petitioner is alleging that the interception module performs both the "diverting" step of a diverting unit and the "controlling" step of a controlling entity.

> Q. What element or component in D'Aviera discloses the diverting step?
> A. The isolator engine. The actions of the isolator engine.

(Williams Dep. at 24:4-7). *See also* Williams Dep. at 22:7-11.

> Q. It's your opinion that the controlling entity is the isolator engine?
> A. Yes.

(Williams Dep. at 25:23-25). *See also* Williams Dep. at 18:12-18.

The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below also confirms that Petitioner is alleging that the "divert[ing]" step only occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the isolator engine 225).

> Q. So I'm asking, in D'Aviera, when are the messages diverted?
> THE WITNESS: The messages are diverted once they enter block

34

> 225 and go through the process of the isolator engine, if at all.
>
> Q. So, in D'Aviera, the diverting step occurs after the messages are received by the isolator engine.
>
> A. After the messages enter block 225, yes[6].

(Williams Dep. at 23:9-10, 16-23).

> Q. The diverting step occurs after the isolator engine has received the messages, correct?
>
> A. Well, for diverting to occur, the diverting has to be performed on a message of the messages, so the diverting process has to have knowledge of a message of the messages, so, if I think I understand your question, the answer is yes.
>
> Q. So it's your opinion that the isolator engine determines whether or not the course of the message should be changed?
>
> A. Yes. That's the thing that makes the decision of whether to, whether to divert the message or not.

(Williams Dep. at 24:11-23).

> Q. So the isolator engine determines whether or not to change the course of the message?
>
> A. Yes. I think, I think of the claim as, in terms of brains and brawn. That brains are, is the decision-maker in terms of deciding whether to

---

[6] Block 225 is in reference to the isolator engine illustrated in Figure 2 of D'Aviera.

35

  block the message, and then the controlling entity is the brawn, to actually perform that operation.

(Williams Dep. at 25:14-20).

  Dr. Williams' testimony acknowledges that the corresponding "divert[ing]" step in D'Aviera is not only performed by the alleged controlling entity (i.e., the isolator engine 225), but that the "divert[ing]" step in D'Aviera occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the isolator engine 225). The claims clearly require that the "diverting" step occurs prior to message being received by the controlling entity. Dr. Williams' testimony confirms that D'Aviera cannot disclose "divert[ing]" a message to a controlling entity, as recited in claims 1 and 24, because the alleged "divert[ing]" step in D'Aviera occurs after the message has already been received by the alleged controlling entity.

  Further, claim 24 requires a diverting unit to divert a message to a separate controlling entity. Dr. Williams' testimony confirms that the diverting unit and the controlling entity are the same thing (i.e., the isolator engine 225), which provides additional evidence that D'Aviera cannot disclose, teach, or suggest the claimed "diverting unit" or the "diverting" step.

  Thus, D'Aviera cannot possibly disclose, teach, or suggest "**diverting a message** of the messages **to a controlling entity**," as recited in claim 1, or "**a**

36

**diverting unit** configured **to divert a message of the messages** sent from the application program and destined for the communication network **to a controlling entity**," as recited in claim 24 (emphasis added).

## VIII. CALDER IN VIEW OF RICHARDSON DOES NOT RENDER ANY OF THE CHALLENGED CLAIMS UNPATENTABLE

### A. Calder and Richardson Fail to Disclose the "Divert[ing]" Step as Required by Independent Claims 1 and 24.

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity. Close scrutiny of Calder and Richardson, on the other hand, reveals that there is no disclosure of an intervening step of "divert[ing]" a message to the claimed controlling entity that is performed after the message has been sent from an application program and before the message is received by the claimed controlling entity.

The Petition and Declaration fail to even identify the structure or process capable of performing this intervening step of "divert[ing]" a message to the claimed controlling entity. This deficiency in Calder and Richardson is highlighted by the Petitioner having to rely on inherency as to where the claimed

37

"diverting unit" is disclosed in these references. *See* Petition at 51; Declaration at Appendix B-1, 24-25. Rather, Petitioner attempts to circumvent this deficiency by pointing to the word "intercepts" to make conclusory arguments that the "divert[ing]" step is disclosed by Calder and Richardson. But these arguments fail because the Calder-Richardson combination does not disclose, teach, or suggest the claimed intervening step of "divert[ing]" a message sent from the application program to the claimed controlling entity, as required by independent claims 1 and 24.

Calder is directed to a method for virtualizing user interfaces and a system for securing an application for execution in a computer, using an interception module. Calder at Abstract. The interception module, which can be included in an application package 115, receives system calls that are made by the application program to the operating system, and acts as a "virtual layer" between the operating system and the application. *Id*. at ¶¶ [0073] and [0098]. As shown in Calder's FIG. 4, reproduced below, an interception module, which is part of the virtual layer 415, intercepts part or all of the system calls made by the application 405 and provides virtual allocation and de-allocation routines 425, a virtualized registry 430, a virtualized files system 435, a virtual other environment 440, a virtualized network 445, and a virtualized graphics interfaces 450. *Id*. at ¶¶ [0084]- [0085].

CASE IPR2014-01133
U.S. Pat. No. 7,218,923



FIG. 4

Petitioner asserts that "Calder discloses an 'interception module' that, like the controlling entity of the '923 Patent, prevents the application from behaving inappropriately and adversely affecting the operation of the computer." Petition at 43 (emphasis added). Petitioner further asserted that Calder inherently discloses a program for diverting messages [system calls] from application programs. Williams Declaration at ¶85." Petition at 44. Accordingly, it appears that Petitioners have characterized Calder's system calls as corresponding to the claimed messages sent towards the communication network and characterized

39

Calder's interception module as corresponding to the claimed controlling entity. Petitioner has not explained how Calder inherently discloses a program for "divert[ing]" system calls, as required by claims 1 and 24.

As shown in FIG. 4 of Calder, reproduced above, Calder does not disclose anything between the application program and the interception module 415 (i.e., the alleged controlling entity) that could perform the intervening "divert[ing]" step, as required by claims 1 and 24. Rather, in Calder, the system calls are preprogrammed to be sent from the application program to the interception module (i.e., the alleged controlling entity). *Id.* at ¶¶ [0076] ("The application package 115 is modified such that it communicates with an interception module."); ¶ [0070].

As discussed above, to meet the claimed "divert[ing]" step, there must be something that "diverts" a message of messages after the message is sent from the application program and before the message is received by the controlling entity. For at least these reasons, Calder cannot teach or suggest the claimed "divert[ing]" step. Further, by pointing to the interception module for both the diverting and control functions, the Petitioner vitiates the diverting limitation.

Patent Owner also notes that Calder's system calls cannot reasonably correspond to the claimed messages sent towards the communication network. Calder's system calls are made by the application program to the operating system to request services from the operating system's kernel. *Id.* at ¶ [0098]. Calder's

40

system calls are not configured for being transmitted through a communication network. System calls that are not organized and suitable for transmission through a communication network cannot reasonably correspond to the claimed messages sent towards the communication network. For these additional reasons, Calder cannot teach or suggest, "sending messages from an application program towards a communication network," as recited in claim 1.

Richardson also cannot teach or suggest anything that could perform the claimed diverting step, and therefore fails to cure the deficiencies of Calder. Richardson does not cure the deficiencies of Calder. In its Decision, the Board found that Richardson does not disclose the "divert[ing]" step, as recited in claims 1 and 24. Further, the claims charts for the proposed Calder-Richardson combination submitted with the Petition and the Declaration do not provide any citations or explanation that Richardson could possibly disclose the claimed diverting unit. *See* Petition at 51; Declaration at Appendix B-1, 24-25.

For at least these reasons, Calder and Richardson cannot render obvious claims 1 or 24.

### B. Testimony of Petitioner's Technical Expert Confirms that Calder and Richardson Fail to Disclose the Diverting Step as Required by Independent Claims 1 and 24

As described above, the plain language of independent claims 1 and 24 clearly require an intervening step of "divert[ing]" a message to the claimed

41

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

controlling entity where the "divert[ing]" step is performed after a message has been sent from the application program and before the message is received by the claimed controlling entity. The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below confirms that Petitioner is alleging that the interception module performs both the "divert[ing]" step of a diverting unit and the "controlling" step of a controlling entity.

> Q. So the interception module performs the diverting step and the controlling step?
> A. Yes.

(Williams Dep. at 41:22-24).

> Q. The interception module disclosed in Calder with regard to the diverting unit, and the interception module as disclosed in Calder with regard to the controlling entity, do those both refer to the same interception module in Calder?
> A. Yes. They are both disclosed in Calder by the interception module.

(Williams Dep. at 44:13-19).

> Q. Other than the interception module, is there any other element in Calder that performs the diverting step?
> A. Not that I've expressed an opinion on.

(Williams Dep. at 41:1-4).

42

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

The cross-examination testimony of Petitioner's technical expert, Dr. Williams, below also confirms that Petitioner is alleging that the "divert[ing]" step only occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the interception module).

> Q. I think we're on the same page but, just to clarify, the diverting step occurs after the interception module has received a system call?
> A. Yes. Again, the brains and the brawn. The interception module receives the information from the application program via system call, and makes a decision based on that, and then the, the controlling entity makes the, is the brawn, makes the process of controlling, whether that message actually gets out to the outside network or not.

(Williams Dep. at 41:12-21).

> Q. Is it your opinion that step 24B[7] occurs after the message that's received by the interception module?
> A. Yes. The interception module has to make decisions on and manipulate the message or the system call, so, of necessity, the information would have to be available to the interception module for it to do its task.

(Williams Dep. at 44:20-45:2).

---

[7] Step 24B refers to the "divert[ing]" step in Dr. Williams' claim chart addressing the Calder-Richardson combination. *See* Declaration at Appendix B-1, 24-25.

43

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

Dr. Williams' testimony acknowledges that the corresponding "divert[ing]" step in Calder is not only performed by the alleged controlling entity (i.e., the interception module), but that the "divert[ing]" step in Calder occurs after the message has already been received and analyzed by the alleged controlling entity (i.e., the interception module). The claims clearly require that the "divert[ing]" step occurs prior to message being received by the controlling entity. Dr. Williams' testimony confirms that Calder cannot disclose "divert[ing]" a message to a controlling entity, as recited in claims 1 and 24, because the alleged "divert[ing]" step in Calder occurs after the message has already been received by the alleged controlling entity.

Further, claim 24 requires a diverting unit to divert a message to a separate controlling entity. Dr. Williams' testimony confirms that the diverting unit and the controlling entity are the same thing (i.e., the interceptor module), which provides additional evidence that Calder cannot disclose, teach, or suggest the claimed "diverting unit" or the "divert[ing]" step.

Thus, Calder cannot possibly disclose, teach, or suggest "**diverting a message** of the messages **to a controlling entity**," as recited in claim 1, or "**a diverting unit** configured to **divert a message of the messages** sent from the application program and destined for the communication network **to a controlling**

44

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

**entity**," as recited in claim 24 (emphasis added).

Richardson does not cure the deficiencies of Calder. In its Decision, the Board found that Richardson does not disclose the "divert[ing]" step, as recited in claims 1 and 24. Further, the claims charts for the proposed Calder and Richardson combination submitted with the Petition and the Declaration do not provide any citations or explanation that Richardson could possibly disclose the claimed diverting unit. *See* Petition at 51; Declaration at Appendix B-1, 24-25.

Thus, Petitioner has not sufficiently alleged, much less established, that Calder, either alone or in combination with Richardson, teaches each limitation of independent claims 1 and 24.

## IX. CONCLUSION

For at least the reasons discussed above, none of the cited references in Grounds A and B disclose, teach, or suggest the claimed "divert[ing]" step, as recited in independent claims 1 and 24. This deficiency in the cited references is confirmed by the cross-examination testimony of Petitioner's technical expert, Dr. Williams. Therefore, Grounds A and B should be denied, and Patent Owner requests that the Board confirm the patentability of the challenged claims.

Petitioner also failed to meet the statutory requirement of identifying all real parties-in-interest, and the Decision should be vacated.

CASE IPR2014-01133
U.S. Pat. No. 7,218,923

Respectfully Submitted,

Dated: May 15, 2015

*/s/ Barry J Bumgardner*
Barry J Bumgardner
Registration No. 38,397
John P. Murphy (*Pro Hac Vice*)
Attorneys for Patent Owner
NELSON BUMGARDNER, P.C.
3131 W. 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111
Facsimile: (817) 377-3485