**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| **CELLULAR COMMUNICATIONS EQUIPMENT LLC,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**HTC CORPORATION, ET AL.,**<br><br>        **Defendants.** | **Civil Action No. 6:16-cv-00363-KNM** <br> **(Consolidated Lead)** <br> **JURY TRIAL DEMANDED** <br><br> **Filed Under Seal** |

**PLAINTIFF'S CLAIM CONSTRUCTION BRIEF REGARDING THE PHRASE**
**"CONTROL … WHETHER THE APPLICATION PROGRAM BEHAVES IN A**
**PREDETERMINED MANNER"**

Pursuant to the Court's Order (Dkt. No. 148), as modified by the parties' stipulation (Dkt. No. 151), Plaintiff Cellular Communications Equipment LLC ("CCE") submits this brief regarding the construction of the phrase "control … whether the application program behaves in a predetermined manner" in U.S. Patent No. 7,218,923 ("the '8,923 Patent").

## I.   INTRODUCTION

The phrase "control … whether the application program behaves in a predetermined manner" appears in independent claims 1, 24, 39, and 40 of the '8,923 Patent. Though only claims 24-26 are at issue in this litigation, the non-asserted claims are highly relevant to the instant claim construction issue. The parties submit the following competing constructions for "control … whether the application program behaves in a predetermined manner":

| CCE's Construction | ZTE's Construction |
|---|---|
| allow, modify, or prohibit a requested behavior from the application program | plain and ordinary meaning[1] |

Initially, the '8,923 Patent states that its invention is directed to a system for "controlling the rights and/or behavior of applications in a terminal, especially in a mobile terminal." Ex. A, '8,923 Patent, with highlighting, at Abstract. The '8,923 Patent recognized that mobile devices were evolving to "provide an open development platform for application developers, allowing independent application developers to design new services and applications for the multimedia environment." *Id.* at 1:32-35. These new services and applications allowed for better utilization of the high-speed cellular networks. *Id.* at 1:26-30. Nevertheless, the '8,923 Patent also recognized a major "drawback related to the open development platform," namely, the possibility of abuse by fraudulent applications. *Id.* at 1:38-39.

The '8,923 Patent "seeks to eliminate the above-described drawback." *Id.* at 1:48-49. To achieve this, the '8,923 Patent introduced a novel solution in which "some of the outbound messages generated by an application in a terminal are diverted to the controlling entity on their

---

[1] Prior to submitting this brief, CCE repeatedly requested that ZTE provide a further explanation of its proposed construction, yet ZTE only informed CCE that it would rely on the term's plain and ordinary meaning. Should ZTE expand upon its "plain and ordinary meaning" construction, CCE reserves the right to seek leave to file an reply brief.

way from the application to the network." *Id.* at 1:60-63. The controlling entity then "evaluates whether any changes are needed in the message or in the behavior of the application." *Id.* at 1:63-65. Based on the evaluation, the controlling entity then either allows, modifies, or prohibits the transmission of the message. *Id.* at 1:65-2:1 ("Based on the evaluation, the control[ling] (*sic.*) entity then returns the message intact or in a modified form. The controlling entity may even prohibit the sending of the message."). Thus, a proper construction of the term "control … whether the application program behaves in a predetermined manner" must—consistent with the specification—include a control sufficient to "allow, modify, or prohibit a requested behavior from the application program."

## II.     ARGUMENTS AND AUTHORITIES

### A.  The Intrinsic Evidence Confirms that CCE's Construction Is Correct.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Phillips v. AWH Corp.*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Consistent with its usage throughout the specification, the proper construction of the phrase "control … whether the application program behaves in a predetermined manner" is "allow, modify, or prohibit a requested behavior from the application program." The claims confirm that both modifying and prohibiting the requested behavior constitute controlling "whether the application program behaves in a predetermined manner." For example, claim 3 depends from

claim 1 and adds the following limitation "wherein the **controlling comprises modifying the message** diverted to the controlling entity." *Id.* at claim 3 (emphasis added). Similarly, claim 4 also depends from claim 1 and adds as a limitation: "wherein the **controlling comprises preventing the message** diverted to the controlling entity from being transmitted to the communication network." *Id.* at claim 4 (emphasis added).

The specification repeatedly discusses that the "control" provided by the controlling entity is either allowing, modifying, or prohibiting requests, such as transmitting a message that comes from the application. First, the "controlling entity evaluates whether any changes are needed in the message or in the behavior of the application." *Id.* at 1:63-65. Based on the evaluation, the control has possible outcomes: (1) *allow* the requested action ("[b]ased on the evaluation, the control entity then returns the message intact"), (2) *modify* the requested action ("[b]ased on the evaluation, the control entity then returns the message … in a modified form"), or (3) *prohibit* the requested action ("[t]he controlling entity may even prohibit the sending of the message."). *Id.* at 1:63-2:1.

The specification does not limit its disclosures to the transmission of messages; indeed, there are several embodiments that do not necessarily involve message transmission. Nevertheless, in all embodiments, the controlling entity, which is also termed the trusted agent,[2] examines the requested behavior and either allows, modifies, or prohibits the request. *See, e.g.*, *id* at Abstract; 1:63-2:1; 4:61-5:4; 6:33-41.

**B.  ZTE's Prior Construction of "Control" Supports CCE's Construction.**

ZTE cannot credibly dispute that the specification supports CCE's position that the proper construction of "control … whether the application program behaves in a predetermined manner"

---

[2] The '8,923 Patent uses the terms "controlling entity" and "trusted agent" interchangeably. Ex. A at 2:9-10 ("Due to its nature, the controlling entity is termed the trusted agent in this context.").

is "allow, modify, or prohibit a requested behavior from the application program." In fact, ZTE

relied on a nearly identical interpretation in its Petition for *inter partes* review of the '8,923 Patent.

Specifically, ZTE took the position that:

> Control of whether the application program behaves includes determining an appropriate disposition of at least some of messages sent from the application program [e.g. transmitting/prohibiting transmission/modifying] in the controlling entity.

Ex. B, IPR2014-01133, Paper 1 at 14 (brackets in original). To support this position, ZTE relied

on the specification and prosecution history. *Id.* at 14-15 (citing '8,923 Patent at 1:63-67; 4:28-38;

4:51-59; 4:61-65; 6:27-48). Having previously taken these positions, ZTE cannot now claim that

allowing, modifying, or prohibiting the message transmission does not constitute control of

whether the application behaves in a predetermined manner. Moreover, on appeal, the Federal

Circuit held that "[t]he controlling entity then checks the message to determine 'whether any

changes are needed in the message or in the behavior of the application,' and will either allow the

message through, modify it, or stop it." *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F.

App'x 978, 979 (Fed. Cir. 2017) (unpublished).

While the IPR process utilizes a different claim construction standard, it is nonetheless

inconsistent for ZTE to rely exclusively on the intrinsic evidence in the IPR to advance a

construction and then to subsequently advocate for an amorphous interpretation in this Court that

disregards the intrinsic evidence. ZTE cannot reconcile this inconsistency and should not be

allowed to depart from its prior position regarding the construction of "control … whether the

application program behaves in a predetermined manner."

## C. ZTE's New "Interpretation" Is Inconsistent with the Plain and Ordinary Meaning Because It Contradicts the Intrinsic Evidence.

Via the expert report of Dr. Heegard, ZTE advances the position that "control" cannot

include denying or even modifying the transmission of a message. Recognizing that its

4

interpretation of control cannot withstand scrutiny, ZTE attempts to skirt the issue by claiming that the phrase should simply be governed by its "plain and ordinary meaning." As an initial matter, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016), *cert. denied sub nom. EON Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 137 S. Ct. 640 (2017). And that is definitely the case here. ZTE cannot hide behind the phrase "plain and ordinary meaning" to introduce an improper claim interpretation to the jury.

CCE made multiple attempts to obtain ZTE's written statement of its current interpretation of the phrase "control … whether the application program behaves in a predetermined manner." Nevertheless, ZTE steadfastly declined to articulate its current interpretation of the phrase.[3] But the testimony of its expert, Dr. Heegard, reveals that ZTE's interpretation is at odds with intrinsic record. By his own admission, Dr. Heegard's interpretation of "control … whether the application program behaves in a predetermined manner" excludes all embodiments of the '8,923 Patent. *See* Dkt. No. 92-2, Heegard Invalidity Report at ¶ 57 ("Thus, the specification does not contain any disclosure or teaching of a controlling entity configured to control 'whether the application program behaves in a predetermined manner in the communication terminal.'"). "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013);

---

[3] *See* Ex. E (Emails between counsel for CCE and counsel for ZTE).

*Parthenon Unified Memory Architecture LLC v. Samsung Elecs. Co.*, 2:14-CV-0687-JRG-RSP, 2016 WL 324981, at *7 (E.D. Tex. Jan. 25, 2016).

Consistent with CCE's proposed construction, Dr. Heegard admits that "you can control a message by allowing it to go, discarding it, or modifying it, which is what the description [of the '8,923 Patent] talks about." Ex. C, Heegard Dep. Tr. 195:7-9. Nevertheless, Dr. Heegard incredibly claims that these examples of "control" do not constitute controlling "whether the application program behaves in a predetermined manner." Indeed, Dr. Heegard testified:

> Q. And in your opinion, denying the transmission of certain messages does not rise to the level of control?
>
> A. That's right.

*Id.* at 82:23-25. Moreover, Dr. Heegard testified that, in his opinion, modifying the application's behavior does not constitute control:

> Q. So you're saying that the idea of controlling the behavior of an application is different from controlling?
>
> A. No. I'm saying the idea that you could -- another way to say it would be, the idea that you can control an application by deleting some of its outputs is not a good idea, because that really doesn't control it. **You can modify its behavior, but that's not control**. …

*Id.* at 80:1-7 (emphasis added).

The position of ZTE[4] and Dr. Heegard directly contradicts claim 3, which states "wherein the **controlling comprises modifying the message** diverted to the controlling entity." Ex. A at claim 3 (emphasis added). Thus, the '8,923 Patent expressly recognizes that modifying the request constitutes control.

---

[4] Though afforded multiple opportunities to distance itself from Dr. Heegard's interpretation (both during the *Daubert* briefing and at the *Daubert* hearing), ZTE has continued to defend and endorse Dr. Heegard's opinions, and thus must be found to have adopted them.

Despite the clear guidance from the claims, ZTE's position and Dr. Heegard's opinion is that control is not satisfied by modifying a requested behavior from the application program, but instead requires unspecified actions that are not discussed at all in the '8,923 Patent:

> Q. But you agreed that modifying or deleting certain outputs from the application is controlling the behavior of the application?
>
> A. **No, I don't. It's influencing. It's not controlling. Controlling is stronger than influencing.** Controlling -- so if you're trying to come up with a system that stops bad characters on your phone, then controlling it should make it -- should be able to stop it from doing it. That's a control.
>
> **Doing something to make it change its behavior is -- is less than controlling**, because all it's doing is it's changing the way that it does things. But it's not making it act the way that you -- it has an unpredictable result, so it's not a control function. If you decided that an application was being mischievous and you disabled it, that would control it. You know it's not going to do anything anymore.
>
> But if you do something that makes it act differently, that's not really control, because it's an unpredictable thing of what -- the stimulus you're giving, what's the effect on the application? It depends on the application. So it's really not control.

Ex. C at 78:5-79:2 (emphasis added). As an initial matter, the claims require only control of "whether the application behaves in a predetermined manner," not control of the application's overall behavior. Nevertheless, Dr. Heegard's testimony makes clear that control of "whether the application program behaves in a predetermined manner" essentially requires disabling the application:

> Q. So **what would you consider to be an example of controlling the behavior of an application**?
>
> A. I gave you an example. **You disable it**.
>
> Q. Can you give me **any other examples**?
>
> A. You could observe an application that was, say, sending a lot of SMS messages or, say, emails. And you might conclude that -- the controlling entity might conclude that, 'You know, that's suspicious

> activity. I think he is sending spams.' And then **you could go in and disable his ability to send any message over the network of any type**. That would be a control. That would stop it from sending -- I don't want malicious -- I don't want you sending spam emails. That would be a way to do it.

*Id.* at 82:1-13 (emphasis added).

Neither the specification nor the prosecution history support ZTE's and Dr. Heegard's interpretation. And ZTE's and Dr. Heegard's contention is contrary to ZTE's position taken during the prior IPR, and contrary to the Federal Circuit's description of the invention.

In fact, ZTE's and Dr. Heegard's interpretation directly contradicts the prosecution history. In its June 2, 2006 Office Action Response, the patentee introduced the phrase at issue. Ex. D, June 2, 2006 Office Action Response at CCE000952. In the corresponding remarks, the patentee stated:

> A terminal can be provided with a controlling entity that controls whether the applications residing in the same terminal behave in a rightful manner. This may advantageously eliminate the possibility of using fraudulent application programs. *The control of an application can be implemented by diverting at least some of the messages* generated by the application program *to the controlling entity* before the messages are transmitted from the terminal to the network.

*Id.* at CCE000966 (emphasis added). Although this passage does not discuss control by the controlling entity, it plainly states that an application may be controlled via some of its outputs. It is improper for ZTE and Dr. Heegard to blatantly ignore this statement in their analysis. The proper construction of "control … whether the application behaves in a predetermined manner," should be consistent with both the specification and the prosecution history. ZTE's and Dr. Heegard's interpretation fails both of these requirements.

## III.     CONCLUSION

For the foregoing reasons, CCE requests that the Court construe the phrase "control …
whether the application program behaves in a predetermined manner" to mean "allow, modify, or
prohibit a requested behavior from the application program." This construction aligns with the
intrinsic evidence and thus represents the plain and ordinary meaning of the term. Conversely,
ZTE's apparent interpretation, though it refuses to articulate it, is contrary to the specification, the
file history, the positions taken by ZTE in its prior *inter partes* review, and the position adopted
by the Federal Circuit regarding the meaning of "control" in the '8,923 Patent. Further, ZTE's
refusal to articulate a proposed construction should not be rewarded. A clear dispute exists
regarding the meaning of the phrase "control … whether the application program behaves in a
predetermined manner." As such, an express construction is necessary.


Dated: July 30, 2018                                    Respectfully submitted,


                                                        By: /s/ *Jeffrey R. Bragalone*
                                                        Jeffrey R. Bragalone (lead attorney)
                                                        Texas Bar No. 02855775
                                                        Terry A. Saad
                                                        Texas Bar No. 24066015
                                                        Jonathan H. Rastegar
                                                        Texas Bar No. 24064043
                                                        Jerry D. Tice, II
                                                        Texas Bar No. 24093263

                                                        **BRAGALONE CONROY PC**
                                                        2200 Ross Avenue
                                                        Suite 4500W
                                                        Dallas, TX 75201
                                                        Tel: (214) 785-6670
                                                        Fax: (214) 785-6680
                                                        jbragalone@bcpc-law.com
                                                        mbond@bcpc-law.com
                                                        tsaad@bcpc-law.com
                                                        jrastegar@bcpc-law.com

jtice@bcpc-law.com

Edward R. Nelson, III
ed@nelbum.com
Texas Bar No. 00797142
Thomas C. Cecil
tom@nelbum.com
Texas Bar No. 24069489
NELSON BUMGARDNER, P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Phone: (817) 377-9111
Fax: (817) 377-3485

Claire Abernathy Henry
claire@wsfirm.com
Texas Bar No. 24053063
Thomas John Ward, Jr.
jw@wsfirm.com
Texas Bar No. 00794818
Wesley Hill
wh@wsfirm.com
Texas Bar No. 24032294
Ward, Smith & Hill, PLLC
PO Box 1231
1507 Bill Owens Pkwy
Longview, Texas 75604
Phone: (903) 757-6400
Fax: (903) 757-2323

**ATTORNEYS FOR PLAINTIFF
CELLULAR COMMUNICATIONS
EQUIPMENT LLC**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being

served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on

July 30, 2018.

*/s/ Jonathan H. Rastegar*
Jonathan H. Rastegar

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective

Order entered in this case.

*/s/ Jonathan H. Rastegar*
Jonathan H. Rastegar