IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CELLULAR COMMUNICATIONS EQUIPMENT LLC,<br><br>                    Plaintiff,<br><br>              v.<br><br>HTC CORPORATION, et al.,<br><br>                    Defendants. | Case No. 6:16-cv-00363-KNM<br><br>**CONSOLIDATED LEAD CASE**<br><br>JURY TRIAL DEMANDED |
| CELLULAR COMMUNICATIONS EQUIPMENT LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>ZTE (USA), INC., et al.,<br><br>                    Defendants. | Case No. 6:16-cv-00375-KNM<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
REGARDING THE "CONTROL" LIMITATION**

Pursuant to the Court's Order (Dk. 148), Defendants ZTE Corporation, ZTE (USA), Inc., and ZTE Solutions Inc. ("ZTE") Responds to Cellular Communications Equipment LLC's ("CCE") Claim Construction Brief Regarding the "Control" Limitation (Dkt. 156) in U.S. Patent No. 7,218,923 ("the 8'923 Patent").

## I.    Statement of the issue

The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). The plain claim language requires the controlling entity to control the application program, not the application program's messages, and the applicant disclaimed message control during prosecution. Yet the specification does not sufficiently describe or enable control of application programs. Should the Court redraft the claims to cover control of the application program's messages instead merely to sustain their validity? It should not.

## II.    Construction of the "control" limitation

The "control" limitation requires a "controlling entity configured to control . . . whether the application program behaves in a predetermined manner." 8'923 patent 10:66-11:3 (claim 24). CCE contends that language should be rewritten to cover control of the application program's messages by construing it to mean "allow, modify, or prohibit a requested behavior from the application program," and arguing that transmission of the application program's message is a "requested behavior." *See* Br. 1-3 ("The specification repeatedly discuss that the 'control' provided by the controlling entity is either allowing, modifying, or prohibiting requests, such as transmitting a message that comes from the application."). CCE is incorrect.

The claim language does not support CCE's construction. The claim language requires a controlling entity configured to control "whether the application program behaves in a

1

predetermined manner." Grammatically, the subject of that limitation is the "controlling entity," the verb is "control," and the object that is acted upon by the subject is the "application program." Thus, by its own terms, the claim language refers to control of the application program—i.e., whether it behaves in a predetermined manner.

The claim language also separately addresses the application program's messages. It requires an application program configured to "send messages towards a communication network," and a diverting unit configured to "divert a message of the messages sent from the application program." 8'923 patent 10:60-63 (claim 24). In each instance, the message or messages are the object that is acted upon by the corresponding subject—the application program sends messages, the diverting unit diverts a message. Thus, the claim language makes clear when the message is intended to be the object of the limitation by expressly referring to the message. For the "control" limitation, control is "based on the message" and must be "before the message is transmitted," *id.*10:66-11:1, but the object being controlled is the application program, not the message.

The specification reflects the same distinction. The summary of the invention, for example, expressly recognizes a distinction between controlling an application's messages and controlling an application's behavior. *See id.* 1:59-2:3. Describing the present invention, it states that "[a]t least some of the outbound messages generated by an application in a terminal are diverted to the controlling entity on their way from the application to the network. The controlling entity evaluates whether any changes are needed in the message *or* **in the behavior of the application**." *Id.*1:60-65 (emphases added). By referring to changes in the message *or* changes in the behavior of the application, the specification distinguishes between control over the message and control over the application's behavior. The description of embodiments likewise does not equate application

2

behavior control with application message control, but rather refers to each separately. *See, e.g., id.* 3:60-63, 4:38-41, 6:27-29 (mentioning the control of rights and behavior of applications); *id.* 4:64-5:4 (describing control over messages, including modifying, transmitting, or prohibiting transmission of messages). Indeed, it concludes by stating that the disclosed mechanism "may also be applied to other type of messages . . . **especially if the behavior of the applications is controlled**," *id.* 8:65-9:1, further reinforcing that the message control mechanism is distinct from control over an application's behavior.

The prosecution history is also contrary to CCE's construction. The application that resulted in the 8'923 Patent originally recited, in relevant part, that "the controlling entity is <u>configured to control the message</u> before it is transmitted to the communication network." Ex. A, Original Application, Filed June 8, 2004 at 18 (emphasis added). On March 29, 2006, the examiner rejected that claim as anticipated by the Quine prior art reference. Ex. B, Non-final Rejection, Filed March 29, 2006. In response, the applicant amended the claim on June 2, 2006, by changing it to require control of the application program's behavior*, rather than control of the application's message. *See* Ex. C, Amendment, filed June 2, 2006, at 8. Specifically, the claims were amended to require the controlling entity be configured to control "whether <u>the application program behaves in a predetermined manner</u> in the communication terminal." *Id.*

The applicant relied on the difference reflected in that amendment to distinguish its claims over the prior art. As the applicant admitted, Quine teaches that "an outbound e-mail message is first submitted to an e-mail address correction module," which assists in "correcting and directing e-mail messages so that they may be received by their intended recipients." *Id*. at 16. The applicant distinguished its newly-amended claim 24 from Quine by arguing that:

> Quine does not in any way consider or **control** based on **whether an application behaves in any particular way**. Instead, <u>Quine focuses on assisting in the correction of email addresses</u>. Accordingly, Quine cannot disclose the above-identified features of claims 24 and 39.

*Id.* at 17. The applicant continued to rely on that distinction to overcome Quine throughout prosecution. *E.g.,* Applicant Remarks, 11/16/2006, at 15 ("Thus, Quine aims to assist the user in correcting and directing e-mail messages so that they may be received by their intended recipients, as explained in paragraph 0059, *rather than controlling the behavior of applications.*" (emphasis added)). Thus, the applicant expressly distinguished its amended claims over the prior art by relying on the difference between *control over application behavior* and the mere *modification of an application's messages*.

By making that amendment and relying on that distinction, the applicant disclaimed the very interpretation that CCE now proposes. As the Supreme Court explained,

> Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.

*Graham v. John Deere*, 383 U.S. 1, 33 (1966); *see also Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc) ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."); *Biogen Idec. Inc. v. GlaxoSmithKline LLC,* 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("Thus, when the patentee unequivocally and unambiguously disavows a certain

meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered."). "Prosecution history disclaimer plays an important role in the patent system." *Biogen*, 713 F.3d at 1095. It promotes public notice and protects the public's reliance on definitive statements made during prosecution. *Id.* In addition, it "provides evidence of how the [PTO] and the inventor understood the patent." *Edwards Lifesciences LLC v. Cook Inc.,* 582 F.3d 1322, 1327 (Fed.Cir.2009). Accordingly, the prosecution history is important evidence against CCE's construction.

CCE contends its construction is supported by statements in a previous *inter partes* review proceeding and the resulting Federal Circuit decision. Br. 3-4. It is not. First, a broader claim construction standard was applied. *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1276–78 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016). Second, the statement quoted from the Federal Circuit decision generally described the patent, it was not a construction of the limitation at issue. Finally, the quoted statement relies on the same aspect the invention summary discussed above, which actually ***reinforces*** the distinction between message control and application behavior control. *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 979 (Fed. Cir. 2017) (unpublished) ("The controlling entity then checks the message to determine 'whether any changes are needed in the message *or* **in the behavior of the application**.'") (quoting the 8'923 patent 1:60-65) (emphases added).

CCE contends a statement in prosecution supports its contention that control of a message can constitute control of an application. Br. 8. It does not. As CCE admits, that statement does **not** relate to control by the controlling entity, rather it refers to diverting messages by the diverting unit. CCE successfully argued to ***distinguish*** between a controlling entity and a diverting unit and their respective functions, *see HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 979 (Fed. Cir. 2017) (unpublished); it should not be permitted to now argue that these entities and functions

5

can be conflated. But more importantly, as discussed above, in the same amendment the applicant expressly distinguished the newly-amended "control" limitation by relying on the difference between **control over application behavior** and the mere **modification of an application's messages**. . *See* Ex. C, Amendment, filed June 2, 2006, at 17. That clear disclaimer precludes the inference CCE attempts to draw from other unrelated remarks.

CCE contends that ZTE's understanding of the claim language is at odds with the intrinsic evidence because the claims would not match the disclosed embodiments. Br. 5-6. That is simply the consequence of the applicant amending the claims beyond what the underlying specification supports. Indeed, the Federal Circuit recognized that very irony in *Liebel-Flasheim*, where claims were amended to remove a pressure jacket requirement despite a specification that only disclosed embodiments with pressure jackets:

> The irony of this situation is that Liebel successfully pressed to have its claims include a jacketless system, but, having won that battle, it then had to show that such a claim was fully enabled, a challenge it could not meet. The motto, "beware of what one asks for," might be applicable here.

*Liebel-Flashiem*, 481 F. 3d 1371, 1380 (Fed. Cir. 2007). *See also Liebel-Flasheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-909 (Fed. Cir. 2004) (rejecting argument that claims require a pressure jacket because the only disclosed embodiments use one). Much like Liebel, CCE pursued an amendment that its specification cannot support. That overextension affects the claim's validity, not its interpretation.

Indeed, that disconnect between the claim language as written and the disclosed embodiments is precisely what drives CCE's construction. As the briefing over Dr. Heegard's expert report discusses, ZTE contends that, as written on its express terms, the "control" limitation

lacks written description support and fails to meet the enablement requirements. (*See* Dkt. 92, 108, 117, 137). CCE hopes to correct that failing through claim construction by redrafting the claims beyond the plain language to better align with those embodiments. Thus, in a form of circular logic, CCE contends the claims must be construed to include the disclosed embodiments so it can then contend the claim, as construed, is sufficiently described and enabled by the disclosed embodiments. The Federal Circuit, however, "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am.*, 358 F.3d at 1374.

The *Chef America* case is instructive. In *Chef America*, the express language of the claim required heating dough "to" a temperature in the range of about 400° F. to 850° F, which would undisputedly burn the dough to a crisp and result in an unusable product. *Id*. at 1373. The patent owner contended the phrase should be interpreted to require heating the dough "at" a temperature in that range, i.e., to apply the heating requirement to the place where the heating takes place (the oven) rather than the item being heated (the dough). *Id*. at 1373-74. Importantly, the disclosed embodiments supported that construction. As the Federal Circuit explained, "[e]ach example states that the dough product is placed in a multi-layered convection oven and baked 'at temperatures' or 'at a temperature' of 680° F. to 850° F." *Id*. at 1372. The patent also stated that its steps "can be accomplished by quickly heating to a temperature in the range of about 400° degrees F. to 850° degrees F." *Id*. at 1372 (quoting the patent).

The Federal Circuit rejected the patent owner's construction and held the claim to its expressly written terms. As the Court noted, the originally drafted claim did not contain temperature limitations; that limitation was added in response to an examiner's rejection. *Id*. at 1374. "In formulating the amendment to the claims to specify the temperature limitation, the

patentees had two models before them: the heating 'to' limitation of the specification and original

Claim 6 or the heating 'at' limitation of the example." *Id.* at 1375. The patentees chose the "to"

limitation, and "there is nothing to indicate that in doing so they intended 'to' to mean 'at.'" *Id.*

The Court rejected the patent owner's argument that the requested construction was required

because "otherwise the patented process could not perform the function the patentees intended,"

concluding that "we have repeatedly declined to rewrite unambiguous patent claim language for

that reason. *Id.; see also id.* at 1374 ("[C]ourts may not redraft claims, whether to make them

operable or to sustain their validity.

Here, as in *Chef America*, the claim language is unambiguous—it refers to control of the

application program's behavior, not control of the application program's messages. Similarly, the

specification refers to both forms of control, *see* 8'923 at 1:60-65 ("The controlling entity evaluates

whether any <u>changes are needed in the message <strong><em>or in the behavior of the application</em></strong></u>." (emphases

added), even if its disclosed examples are directed at only one. And like in *Chef America*, the

applicant made a choice during prosecution to amend the claims to rely on one form of control

over the other. Indeed, here the applicant expressly amended the limitation to ***change*** it from

control of the message to control of the application program behavior. *See* Ex. C, Amendment,

filed June 2, 2006, at 8, 17. Thus, much like in *Chef America*, CCE should not be permitted to

redraft its claims, even if doing so would better sustain their validity under 35 U.S.C. § 112.

**III.    CONCLUSION**

The originally-filed claim required a controlling entity configured to control an

application's message. To overcome a rejection, the applicant amended it to require a controlling

entity configured to control whether the ***application program*** behaves in a predetermined manner,

rather than modification of a message as the prior art disclosed. That constitutes a disavowal. CCE

hopes to sustain the claim's validity by redrafting it through claim construction, but that construction would recapture exactly what the applicant disavowed. Thus, CCE's construction should be rejected, and the claim's plain language should control.

DATED: August 6, 2018        Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:    */s/ Nicole S. Cunningham*      
      Steven A. Moore (232114)
      steve.moore@pillsburylaw.com
      Callie A. Bjurstrom (137816)
      callie.bjurstrom@pillsburylaw.com
      Nicole S. Cunningham (234390)
      nicole.cunningham@pillsburylaw.com
      Sara J. O'Connell (238328)
      sara.oconnell@pillsburylaw.com Matthew R.
      Stephens (288223)
      matthew.stephens@pillsburylaw.com
      PILLSBURY WINTHROP SHAW PITTMAN LLP
      501 West Broadway, Suite 1100
      San Diego, CA 92101-3575
      619.234.5000
      619.236.1995

      Brian C. Nash (24051103)
      brian.nash@pillsburylaw.com
      401 Congress Avenue, Suite 1700
      Austin, TX 78701-3797
      512.580.9609
      512.580.9601

      *Attorneys for Defendants*
      *ZTE Corporation, ZTE (USA), Inc., and ZTE*
      *Solutions Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served on August 6, 2018 with a copy of this document via electronic mail pursuant to Local Rule CV-5.

*/s/ Nicole S. Cunningham*
Nicole S. Cunningham